In the Matter of Judicial Disciplinary Proceedings Against The Honorable William Carver, Circuit Judge, Winnebago County.

Supreme Court

*No. 94–1185–J. Oral argument April 6, 1995.—Decided May 3, 1995.*

(Also reported in 531 N.W.2d 62.)

For the Honorable William Carver, there were briefs by *Bruce F. Ehlke* and *Lawton & Cates, S.C.,* Madison and oral argument by *Bruce F. Ehlke.*

For the Judicial Commission there was a brief by *Kevin B. Dunn,* Milwaukee and *James C. Alexander,* Executive Director, *Wisconsin Judicial Commission,* Madison and oral argument by *Kevin B. Dunn*

PER CURIAM. *Judicial disciplinary proceeding; judge suspended from office.*

This is a review, pursuant to sec. 757.91, Stats., of the findings of fact and conclusions of law of the judicial conduct panel in this judicial disciplinary proceeding against the Honorable William Carver, circuit judge for Winnebago county. The panel concluded that Judge Carver engaged in judicial misconduct by the comments he made from the bench in the course of disqualifying himself at the initial appearance of a defendant charged with sports gambling. In those comments, Judge Carver minimized the seriousness of the offense charged and questioned the legitimacy of the investigation and prosecution in the case before him and in three other cases of sports gambling pending in

other branches of Winnebago County Circuit Court and he suggested to the public and to his fellow judges that minimum sentences should be imposed for such crimes. The panel also concluded that Judge Carver engaged in judicial misconduct by misrepresenting in his comments from the bench that he had not been contacted by the defendant, who was a friend of his, or asked by him for special treatment. As discipline for that misconduct, the panel, consisting of Court of Appeals Judges Gordon Myse, Daniel LaRocque and Robert Sundby, recommended that the court publicly reprimand Judge Carver.

The court adopts the panel's findings, as it has not been shown that they are clearly erroneous or that the inferences drawn by the panel from its findings are unreasonable. In addition to adopting the panel's conclusions regarding Judge Carver's misconduct, the court further concludes, on the basis of the panel's findings, that Judge Carver engaged in judicial misconduct by giving the appearance of partiality toward the defendant when he did not disqualify himself from the pending case promptly upon determining there was cause for his disqualification but gave the impression he would preside in the case and by not disclosing to counsel for the parties or in his comments from the bench his receipt of *ex parte* communications from the defendant concerning the case. The court determines that the seriousness of Judge Carver's judicial misconduct warrants his suspension from judicial office for a period of 15 days.

It is essential to the proper functioning of our judicial system that its participants and the public be assured of the objectivity and impartiality of its judges. To that end, judges must be able to set aside their

personal views or, when they are unable to do so, they must refrain from acting in their judicial role. Judge Carver's failure to do either in the instant matter has been detrimental to the integrity of our judiciary. His use of the judicial office to remain as the judge in a criminal case pending against a friend in order to express publicly, from the bench and on the record his personal views concerning the seriousness of the criminal charge pending against his friend and similar charges pending in other cases, his criticism of the gambling investigation in which he himself figured, and his misrepresentation that the defendant in the case before him had not contacted him or sought special treatment in the case warrant the suspension from office we impose.

The panel made the following findings of fact which, with an exception noted below, are uncontested. In the course of a gambling investigation being conducted in Winnebago county, Warren Wilcox was arrested in January, 1993 for commercial gambling. Judge Carver, who had known Mr. Wilcox for more than 20 years and considered him a friend, was aware since 1991 of Mr. Wilcox's reputation as a sports bookie, a person who receives and pays off bets on sporting events.

At the time of his arrest and during the months following, Mr. Wilcox was repeatedly asked by the authorities whether Judge Carver and other local officials had engaged in sports betting. At the initial questioning, the district attorney told Mr. Wilcox's attorney that Mr. Wilcox was going to "give us Carver." However, when the attorney asked his client whether he had any information implicating Judge Carver in the gambling, Mr. Wilcox said he did not and his attorney relayed that information to the investigators.

The investigators continued to question Mr. Wilcox about Judge Carver's and the other officials' possible involvement in sports betting. In early March, 1993, Mr. Wilcox told Judge Carver he planned to take a polygraph examination to establish that he was truthful when he denied that Judge Carver or the other officials had engaged in sports betting. A few days later he telephoned the judge that he had passed that examination.

Later that month, a criminal complaint was filed against Mr. Wilcox and, after his request for substitution of judge was granted, the case was randomly assigned on March 20, 1993 to Judge Carver, who was on vacation in another state. Judge Carver's judicial assistant telephoned him there on March 22, 1993 and told him of the assignment. Knowing he was acquainted with the defendant, the assistant asked the judge if she should prepare the papers for administrative reassignment of the case, the procedure by which a form for a judge's recusal from an assigned case is completed, including the reasons for it, and is sent to the court administrator, who then has the case reassigned to another judge. Judge Carver told his assistant not to prepare the form and instructed her to schedule the defendant's initial appearance in the usual manner for the day following his planned return to work.

On the basis of testimony at the disciplinary hearing, the panel found that from the time he learned of its assignment to him, Judge Carver never intended to continue as judge in the Wilcox case but he did not immediately disqualify himself from it because he wanted to set forth the reasons for his disqualification on the record at the defendant's initial appearance. Judge Carver testified that he did not tell his assistant

what he intended to do in the case because he believed she had been conveying confidential information from his office to others, including the district attorney.

When he returned to his office on March 29, 1993, Judge Carver learned that Mr. Wilcox's initial appearance had been rescheduled to April 5, 1993. On March 31, 1993, when a deputy district attorney told him that his office was preparing a motion for his disqualification, Judge Carver's response suggested that his acquaintance with Mr. Wilcox would not require his disqualification. At some time prior to the initial appearance, Mr. Wilcox's attorney asked Judge Carver's judicial assistant whether the judge was going to remain in the Wilcox case, to which the assistant responded that, as far as she knew, he was. The assistant gave the same response when asked that question by the district attorney.

Judge Carver had been told in mid-January, 1993 that gambling suspects were being questioned about him and asked whether he had placed bets with them. Following his return from vacation and while the Wilcox case remained assigned to him, the judge had conversations about the gambling investigation with a number of people, including three defendants in pending sports gambling cases, one of the officials about whom the defendants had been questioned and Mr. Wilcox's roommate. The defendants reported to him that the authorities had asked whether they had information implicating him or any public official in sports betting and one of them said he had been offered a reduction in charges if he would implicate a public official. Judge Carver did not initiate those conversations but he did discuss the gambling investigation with several other persons to determine whether the police or the prosecutor's office had offered improper induce-

ments to the defendants if they would implicate him or other public officials. From those conversations, Judge Carver concluded that the police and the district attorney had done so.

The panel found, however, that the assistant district attorney in charge of the investigation did not offer to reduce any charges or recommend a less severe penalty if any of the suspects would implicate Judge Carver or other public officials in sports betting and did not authorize any of the investigating officers to do so. It further found that Mr. Wilcox was never expressly offered a reduction in charge or penalty in exchange for information implicating Judge Carver or any other public official, although Mr. Wilcox understood that if he were able to do so, he would be given some consideration.

Late in the afternoon of Friday, April 2, 1993, the prosecution filed a motion requesting that Judge Carver disqualify himself in the Wilcox case. Judge Carver had already left for the day and his assistant telephoned him at home and told him the motion had been filed and that Mr. Wilcox's attorney did not object to it. Judge Carver did not disqualify himself administratively at that time because he still wanted to state on the record his reasons for disqualifying himself. That evening, Judge Carver spoke briefly with Mr. Wilcox's roommate, whom he encountered at a restaurant, and told him he was going to disqualify himself from the case and briefly discussed the questioning of Mr. Wilcox and other suspects regarding the possible involvement of certain public officials in gambling. Judge Carver later told an attorney friend with whom he was dining that he would disqualify himself from the Wilcox case.

On Sunday, April 4, 1993, Mr. Wilcox had his roommate deliver to Judge Carver at his home a sealed envelope containing two items. The first was an undated note addressed to "Bill" and signed "Buzz," Mr. Wilcox's nickname, stating that Judge Carver's name had been mentioned to almost every person arrested in the gambling investigation and was brought up frequently in Mr. Wilcox's interrogation, together with the names of other officials. That note also stated that the investigators stopped questioning Mr. Wilcox about Judge Carver after he took the polygraph exam. The second document in the envelope was the following letter, dated "Saturday":

"Bill,

Don't know if this is legal or not, I really don't care. I understand why your [sic] passing on my case. Just wish you would have done it sooner. I gave you the chance to pass when you were on vacation.

. . . [The District attorney's office] have all my records of how much was wagered for the year and there's no way it came to $2.5 million. I want to get them to a CPA and prove it. They built up the numbers because they didn't get the who's that they wanted.

When this all came down, I was labeled as the bookie 'king-pin.' That's totally wrong. They never once mentioned that I was working for someone and getting paid per week for doing things someone told me to do. Got paid 300–400–500 per year for three years. I'm guilty, I know that, but guilty of working for someone, not running it. I told them everything they asked and got tired of saying no about people they thought I was lying about. I took a lie-detector test, paid for it myself, added alot of my own questions to it and passed with flying colors.

I guess I just don't quite understand why I have been charged with two felonies. I was just working for someone, not running it. The DA seems to be out to hang me and I can't do anything about it. It's been almost four months of hell for me, still haven't been to court and all the DA, press TV does is keep burying me.

If [my attorney] can keep me from showing up Monday I'm going to pass. If you can pass these words on to the next judge, without getting into trouble, I'd appreciate it. If you mention my name on Monday say something good or say nothing at all.

Hope we remain the best of friends,
Buzz"

On the morning of April 5, 1993, shortly before Mr. Wilcox's initial appearance was scheduled to begin, the prosecution filed an affidavit in support of the disqualification motion it had filed the preceding Friday. That affidavit recited that Mr. Wilcox had visited Judge Carver in his chambers on one occasion in August or September of 1992 and that in September of that year had telephoned Judge Carver's chambers. The affidavit also stated that entry forms and betting rules for a golf tournament Judge Carver held each year had been found in Mr. Wilcox's trash. The district attorney's office did not include that affidavit when it filed the disqualification motion the preceding Friday because it hoped Judge Carver would administratively disqualify himself in response to the motion and prior to the initial appearance. The panel found that because Judge Carver had not told the prosecution that he intended to disqualify himself and because the prosecutor believed that the judge was required by law to disqualify himself immediately, the prosecution inferred that Judge Carver intended to remain in the case.

144

At the initial appearance, Judge Carver made a lengthy statement from the bench in which he cited his long acquaintance with the defendant as the reason for disqualifying himself and criticized the decision to prosecute Mr. Wilcox and other defendants charged with sports betting and the manner in which the gambling investigation had been conducted. Judge Carver asserted that Mr. Wilcox had not contacted the court "in any way or manner" and twice stated that he had not asked the court for any special treatment or special consideration. The panel found that when he made those statements, Judge Carver was aware that he had received two written communications from Mr. Wilcox at his home the preceding day concerning the gambling investigation and the pending case. While it accepted Judge Carver's testimony that he believed those letters from Mr. Wilcox to be private communications addressed to him personally and delivered to him at his home, not to him in his judicial capacity, the panel concluded that his belief was unreasonable.

In his comments from the bench, Judge Carver insisted that it was necessary to consider the Wilcox case and the other pending sports gambling cases in the perspective of legalized gambling being conducted in Wisconsin. In light of the extent of legal gambling, Judge Carver suggested that before law enforcement officers investigate gambling activities and before the courts impose sentences in the pending cases, consideration should be given to the state of the law proscribing gambling and the intent of the legislature regarding it. He also pointed out that the defendants had not engaged in dealing drugs or committed robberies or "other serious criminal activities." Judge Carver said, "What is this all about? Where is this entire investigation going? Why are these people going to jail for this

type of activity? I guess that's what the public's going to have to answer."

In expressing his concern with the way the gambling investigation was conducted, Judge Carver adverted to the fact that suspects were being asked to name persons who had been placing bets, including himself and other public officials. He asserted that they had been told that if they would name those public officials, their cases would be dismissed; if not, the district attorney and the police would recommend jail sentences. Judge Carver then questioned why the police were concerned about the public officials, suggesting that it was improper interrogation to threaten a suspect or a defendant with incarceration if he or she did not name public officials. The panel found that Judge Carver had a good faith belief that extraordinary and improper pressure to implicate public officials, including himself, had been applied to several of the gambling defendants.

Following his comments at the initial appearance, Judge Carver took no part in the Wilcox case and it was reassigned to another judge.

On the basis of those facts, the panel concluded first that Judge Carver violated SCR 60.16,[1] the Code of Judicial Ethics provision that prohibits a judge from commenting on the merits of a pending proceeding or making any comment that might affect its outcome, by the comments he made at the initial appearance minimizing the seriousness of the gambling charges pending against Mr. Wilcox and the other defendants,

---

[1] SCR 60.16 provides:

**Comment.**
A judge shall not, while a judicial proceeding is pending, make any comment upon its merits or make any comment which might affect its outcome or preclude a fair trial.

questioning the legitimacy of the gambling prosecutions and suggesting to the public and to his fellow judges in Oshkosh that minimum sentences would be appropriate. While it noted that he may not have intended to influence the outcome of any of the pending cases, the panel concluded that Judge Carver's comments were likely to have affected the disposition of the Wilcox case and the other gambling cases.

Further, the panel concluded, those comments might have affected the public's perception of both the Wilcox prosecution and the underlying gambling investigation and his criticism of the police and the district attorney's office might have affected the public's confidence in the criminal justice system. In addition, as Mr. Wilcox had not waived his right to a jury trial, those comments might have affected the court's ability to impanel an impartial jury.

The panel next concluded that Judge Carver did not engage in judicial misconduct by discussing with other persons, including other criminal defendants, the propriety of the gambling investigation and prosecutions. Having determined, albeit privately, to disqualify himself from the Wilcox case, the panel considered it proper that Judge Carver inquire into what he suspected was improper conduct in the gambling investigation. However, the panel pointed out that a judge may not publicly express an opinion as to such impropriety if that expression may affect the outcome of or preclude a fair trial in a pending proceeding.

Finally, the panel concluded that Judge Carver's public misrepresentations that Mr. Wilcox had not contacted him or asked him for special treatment violated SCR 60.01(6),[2] the standard that provides, in pertinent

[2] SCR 60.01 provides, in part:

part, "[A judge] should conduct all judicial proceedings so as to reflect the importance and seriousness of the inquiry to ascertain the truth." The panel further concluded that his violation of that standard was aggravated, thus constituting judicial misconduct,[3] because it was an on-the-record misrepresentation in a pending case of substantial public interest. Having determined that the two letters Judge Carver received from Mr. Wilcox while the case was pending before him and which related to that case were public communications, not personal letters to the judge as a private citizen, the panel concluded that Judge Carver's statements from the bench "obscured the truth and denigrated the integrity of the court."

The panel's conclusion that Judge Carver's statement that Mr. Wilcox had not contacted the court "in any way or manner" was an aggravated violation of SCR 60.01(6) was also based on the fact that he made it less than 24 hours after receiving from Mr. Wilcox two letters that pertained to the action pending before him, addressed the merits of that action and asked him to do

**Standards.**

The following standards set forth the significant qualities of the ideal judge.

. . .

(6)   A judge should be considerate and courteous to litigants, jurors, witnesses, attorneys and all in attendance upon the court. A judge should require similar conduct on the part of clerks, court officials and counsel. He or she should conduct all judicial proceedings so as to reflect the importance and seriousness of the inquiry to ascertain the truth.

[3] Judicial misconduct is defined by sec. 757.81, Stats., to include wilful violation of a rule of the Code of Judicial Ethics. A judge's violation of a "standard" set forth in SCR 60.01 does not rise to the level of a rule violation unless it is "aggravated or persistent." SCR 60.17.

something in it for Mr. Wilcox's benefit. Further, the panel noted that Judge Carver had admitted he was aware of the letters when he made that statement. Thus, the panel determined that the misrepresentation, while not actually affecting the merits of any pending case, reflected a significant lack of candor by the judge which "obscured the totality of the circumstances surrounding Judge Carver's disqualification."

In this review, Judge Carver took the position that a judge should not be disciplined for making comments on the merits of a pending case that are consistent with the standard of the Code of Judicial Ethics urging judges to criticize and correct what they perceive to be unprofessional conduct of attorneys, SCR 60.01(7),[4] unless those comments actually have an adverse effect on the outcome of a pending case. In this regard, Judge Carver asserted his good faith belief that prosecuting attorneys had improperly pressured several gambling defendants to implicate public officials and contended that his comments were consistent with SCR 60.01(7).

The panel properly deemed Judge Carver's reliance on SCR 60.01(7) misplaced. It correctly pointed out that Judge Carver had other means to express his concerns regarding the propriety of the prosecution's conduct in the gambling investigation that would not

---

[4] SCR 60.01 provides, in part:

**Standards.**

The following standards set forth the significant qualities of the ideal judge:

. . .

(7) A judge should utilize opportunities to criticize and correct unprofessional conduct of attorneys and counselors, brought to his or her attention; and, if adverse comment is not a sufficient corrective, should send the matter at once to the proper investigating disciplinary authorities.

have risked his impermissibly commenting on the merits of pending cases.

Judge Carver also contended that he was not required to disclose his receipt of the letters from Mr. Wilcox because he acknowledged his personal relationship with him at the initial appearance and disqualified himself from the case. That contention has no merit. The letters from Mr. Wilcox did more than establish a personal relationship between the judge and the defendant; they addressed directly the merits of the case against Mr. Wilcox and asked Judge Carver to take specific action for his benefit.

Judge Carver's third argument is that his failure to mention the communications from Mr. Wilcox in his comments at the initial appearance was inadvertent, not wilful or aggravated. While he did not dispute the panel's finding that he had admitted he was aware of the Wilcox letters when he stated from the bench that Mr. Wilcox had not contacted the court or asked for special consideration or treatment, Judge Carver contended that the panel misunderstood his testimony. He asserted that when he made that statement he had for the moment forgotten completely about the letters.

Judge Carver's contention that his statement was inadvertent contradicts the panel's reasonable inference that when he made that statement he knew he had received the two letters from Mr. Wilcox the preceding day. In respect to Judge Carver's assertion that he had temporarily forgotten about the letters because he believed they were personal, private communications, not communications with "the court," that belief was unreasonable. The panel properly concluded that Judge Carver's misrepresentation constituted a "deliberate and significant lack of candor" which was aggravated because it was made on the record in a

pending case of substantial public interest and concealed from the parties and the public an *ex parte* communication from the defendant asking him for favorable treatment. Moreover, it concealed the judge's possible motivation for his comments favorable to Mr. Wilcox at the initial appearance.

We adopt the panel's findings of fact and conclusions regarding Judge Carver's violation of the Code of Judicial Ethics. We also reach additional conclusions concerning Judge Carver's judicial misconduct in respect to violations of the Code of Judicial Ethics provisions the Judicial Commission had alleged in this proceeding but the panel did not address.

First, the Commission contended that Judge Carver's conduct constituted an aggravated violation of SCR 60.01(3),[5] which requires a judge to be impartial and administer the law without partiality or the appearance of partiality. It is the Commission's position that from the time he learned that the Wilcox case was assigned to him, Judge Carver acted in such a way as to give the appearance of partiality toward the defendant and, in fact, demonstrated partiality.

The Commission asserted that Judge Carver was required by law to disqualify himself as soon as he

---

[5] SCR 60.01 provides, in part:

**Standards.**
The following standards set forth the significant qualities of the ideal judge.

. . .

(3) A judge should be temperate, attentive, patient, industrious and, above all, impartial. A judge should administer the law free of partiality and the appearance of partiality. To that end he or she should avoid membership in, or association with, an organization whose objectives, policies or activities are incompatible with the fair and evenhanded administration of justice.

151

learned on March 22, 1993 that the Wilcox case was assigned to him and determined that because of his acquaintance with the defendant he could not remain in the case. Section 757.19(4), Stats.[6] The Commission argued that the statutory requirement of disqualification was unaffected by Judge Carver's personal desire to explain from the bench the basis for his disqualification—his stated reason for not administratively disqualifying himself when informed that the Wilcox case had been assigned to him and asked whether the form for its reassignment should be prepared. Moreover, Judge Carver did not disqualify himself and have the case reassigned administratively when he was told on the Friday afternoon prior to the defendant's initial appearance that the prosecution had filed a motion seeking his disqualification. As the Commission pointed out, the statute requires a disqualified judge to file in writing the reasons for disqualification and request the assignment of another judge. Section 757.19(5), Stats.[7]

The Commission contended that by not immediately disqualifying himself from the case and by resisting suggestions that he do so, Judge Carver led others, including the prosecutor, to believe he would remain in the case. Then, while the case remained assigned to him, he discussed the gambling investiga-

---

[6] Section 757.19(4) provides:

(4)  Any disqualification under sub. (2) in a civil or criminal action or proceeding must occur, unless waived under sub. (3), when the factors creating such disqualification first become known to the judge.

[7] Section 757.19(5) provides:

(5)  When a judge is disqualified, the judge shall file in writing the reasons and the assignment of another judge shall be requested under s. 751.03.

tion with the defendants in three similar gambling cases pending in other branches of the court. Finally, the Commission asserted, Judge Carver demonstrated actual partiality by his comments at the initial appearance favorable to Mr. Wilcox.

The second conclusion the Judicial Commission asked the court to reach is that Judge Carver violated SCR 60.01(10)[8] by accepting and considering the communications from Mr. Wilcox the day before the initial appearance and by not disclosing his receipt of them to the parties in the pending case or in his comments from the bench. The Commission asserted that his violation of that standard was aggravated for the reason that those letters asked him to convey the defendant's comments on the merits of the case to the judge who would hear the case and also asked Judge Carver either to say something good about the defendant at the initial appearance the following day or to say nothing at all. The Commission contended that by not disclosing those communications and by misrepresenting from the bench that Mr. Wilcox had not contacted him, Judge Carver effectively concealed from the prosecution, the public and any judge succeeding him in the Wilcox case

---

[8] At the time relevant here, SCR 60.01 provided, in part:

**Standards.**
The following standards set forth the significant qualities of the ideal judge.

. . .

(10)   A judge should always bear in mind the need of scrupulous adherence to the rules of fair play. A judge should not permit private interviews, arguments, briefs or communications designed to influence his or her decision . . ..

The court amended that provision in May, 1994, retaining the above-cited language, and adopted a rule, SCR 60.20, in regard to a judge's initiating, permitting, engaging in or considering ex parte communications.

what could have been perceived as the motivation for his comments from the bench favorable to Mr. Wilcox.

We determine that the additional conclusions urged by the Judicial Commission concerning Judge Carver's violation of the Code of Judicial Ethics are proper, as they are based on the facts established in this proceeding. Accordingly, we conclude that, in addition to the violations specified by the panel, Judge Carver's aggravated violations of SCR 60.01(3) and (10) constitute judicial misconduct.

The seriousness of Judge Carver's judicial misconduct warrants discipline more severe than the public reprimand recommended by the conduct panel. For a period of two weeks Judge Carver purposely chose not to disqualify himself from a criminal case against a defendant with whom he was personally acquainted, even after determining in the first instance that his relationship with the defendant required his disqualification. Because that relationship was common knowledge in the community and because the case arose from an investigation in which it was widely known that the judge himself was possibly implicated, Judge Carver's failure to remove himself from the case undermined the public's trust in a fair and impartial judiciary.

Judge Carver then used his judicial office to take the bench at the initial appearance in that case, ostensibly to explain the reasons for disqualifying himself from it but in fact to comment at length on the merits of that and other pending cases in respect to the seriousness of the offenses charged and the kind of sentence that should be imposed for them and to criticize the conduct of the prosecution in an investigation that sought to implicate the judge. Further, Judge Carver made it a point to state, contrary to the fact, that the

defendant had not contacted him or sought special treatment, when his comments were consistent with the defendant's *ex parte* requests to the judge. By that conduct, Judge Carver exhibited the appearance, if not the reality, of partiality in the matter before him and in respect to the other pending cases.

Judge Carver's aggravated failure to conduct himself in the Wilcox case impartially, objectively and truthfully warrants his suspension from judicial office for 15 days.

IT IS ORDERED that William Carver is suspended from the office of circuit judge without compensation and prohibited from exercising any of the powers or duties of a circuit judge in Wisconsin for a period of 15 days, commencing June 5, 1995.