*911 OPINION
By the Court, Shearing, C. J.:
On May 22, 2000, a special prosecutor for the Nevada Commission on Judicial Discipline (the Commission) filed charges against the Honorable Donald M. Mosley, District Judge for the Eighth Judicial District Court. The complaint contained the following allegations:
Count I, that Judge Mosley violated Nevada Code of Judicial Conduct (NCJC) Canon 2B in August 1999 by writing a letter on official judicial letterhead to the principal at his son’s school;
Count II, that Judge Mosley violated NCJC Canon 2B in February 1998 by writing a letter on official judicial letterhead to the principal at his son’s school;
Count HI, that Judge Mosley violated NCJC Canons 1, 2, 2A, 2B and 3B(7) in August 1999 by engaging in an ex parte conversation with his friend, Barbara Orcutt, regarding the arrest and release of Robert D’Amore;
Count IV, that Judge Mosley violated NCJC Canons 1, 2, 2A and 2B in August 1999 by ordering the release of Robert D’Amore on his own recognizance (OR), without notifying the district attorney’s office, after the police arrested D’Amore on a bench warrant issued by a different district court judge;
Count V, that Judge Mosley violated NCJC Canon 3B(7) by engaging in an ex parte telephone conversation with Catherine Woolf, an attorney representing Joseph McLaughlin in a criminal case that was assigned to Judge Mosley’s chambers for sentencing;
Count VI, that Judge Mosley violated NCJC Canon 3B(7) in August 1997 by engaging in an ex parte conversation in his chambers with Woolf;
Count VII, that Judge Mosley violated NCJC Canon 3B(7) in August 1997 by participating in an ex parte conversation with Woolf, McLaughlin and McLaughlin’s wife;
Count VIII, that Judge Mosley violated NCJC Canons 1, 2, 2A and 2B by failing to recuse himself from McLaughlin’s criminal case until after Mrs. McLaughlin had testified in Judge Mosley’s custody case;
Count IX, that Judge Mosley violated NCJC Canons 1, 2 and 2B by communicating with McLaughlin’s wife regarding McLaughlin’s incarceration;
Count X, that Judge Mosley violated NCJC Canons 1, 2 and 2B by assisting McLaughlin’s wife in obtaining the return of her vehicle; and
Count XI, that Judge Mosley violated NCJC Canons 1, 2, 2A and 2B by continuing to communicate with McLaughlin and his *912 wife after October 10, 1997, the date of Judge Mosley’s recusal in the McLaughlin case, the continued communication creating an appearance that Judge Mosley was rewarding the McLaughlins for assisting him in his custody dispute.
From February 25, 2002, through February 28, 2002, the Commission conducted a formal evidentiary hearing. The Commission concluded that Judge Mosley had committed the violations alleged in Counts I, II, III, IV, VI, VII, and VIII, and dismissed Counts V, IX, X, and XI. The Commission also determined that the appropriate discipline was to require Judge Mosley to attend the first general ethics course at the National Judicial College at his own expense, to pay a $5,000 fine, and to receive strongly worded censures for violating ethics rules.
Judge Mosley appeals, alleging that there was insufficient evidence to support the Commission’s findings and that the Commission erred in other respects. We conclude that clear and convincing evidence supports the Commission’s findings on all counts but Counts III and IV and affirm the Commission’s determination of the appropriate discipline for Judge Mosley.

DISCUSSION

Standard of review

Rule 25 of the Procedural Rules for the Nevada Commission on Judicial Discipline (CPR) provides that “[cjounsel appointed by the commission to present the evidence against the respondent have the burden of proving, by clear and convincing legal evidence, the facts justifying discipline in conformity with averments of the formal statement of charges.’ ’ In Goldman v. Nevada Commission on Judicial Discipline, this court held that Article 6, Section 21 of the Nevada Constitution “does not contemplate this court’s de novo or independent review of factual determinations of the commission on appeal.”[2] This court went on to say:
To the contrary, the constitution confines the scope of appellate review of the commission’s factual findings to a determination of whether the evidence in the record as a whole provides clear and convincing support for the commission’s findings. The commission’s factual findings may not be disregarded on appeal merely because the circumstances involved might also be reasonably reconciled with contrary findings of fact.[3]

*913
Counts I & II: Use of judicial letterhead

The evidence adduced at the hearing established that Judge Mosley and his ex-girlfriend, Terry Mosley, who is also referred to as Terry Figliuzzi, have a child named Michael. Judge Mosley and Figliuzzi have been involved in a bitter child custody dispute. In June 1998, Judge Mosley was awarded custody of Michael. After that custody order was issued, Judge Mosley sent two letters to Michael’s school. Both of those letters were written on Eighth Judicial District Court letterhead. The letters explained that Judge Mosley had been awarded custody of his son, and asked that the school prohibit Figliuzzi from visiting Michael at school.
The letters were addressed to the principals of Michael’s school, Diane Reitz and Frank Cooper. Reitz testified that it was part of the school’s procedure to have a letter along with a custody order placed in the student’s file. Reitz and Cooper testified that they were not influenced by the fact that Judge Mosley was a district court judge and that they knew, before receiving the letters, that he was a judge.
The Commission found that Judge Mosley violated NCJC Canon 2B. For Counts I and II, the Commission ordered Judge Mosley to attend the first available general ethics course at the National Judicial College at his own expense.
NCJC Canon 2B provides, in pertinent part:
A judge shall not allow family, social, political or other relationships to influence the judge’s judicial conduct or judgment. A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others; nor shall a judge convey or permit others to convey the impression that they are in a special position to influence the judge.
Whether judicial letterhead may be used for personal reasons is an issue of first impression for this court. While NCJC Canon 2B does not specifically address the use of judicial letterhead for personal purposes, the commentary to NCJC Canon 2B provides some guidance:
Judges should distinguish between proper and improper use of the prestige of office in all of their activities. For example, it would be improper for a judge to allude to his or her judgeship to gain a personal advantage such as deferential treatment when stopped by a police officer for a traffic offense. Similarly, judicial letterhead must not be used for conducting a judge’s personal business.
A judge must avoid lending the prestige of judicial office for the advancement of the private interests of others. For ex *914 ample, a judge must not use the judge’s judicial position to gain advantage in a civil suit involving a member of the judge’s family.
Judge Mosley asserts that he did not violate NCJC Canon 2B because both school principals knew that he was a district court judge before he sent letters to them on judicial letterhead. Judge Mosley also contends that because principals Cooper and Reitz did not provide special treatment to Judge Mosley, he was not advancing his position by using his judicial letterhead.
The United States Supreme Court, in interpreting a section of the federal judicial code, has held that a judge is not to be evaluated by a subjective standard, but by the standard of an objective reasonable person, because “people who have not served on the bench are often all too willing to indulge suspicions and doubts concerning the integrity of judges.”[4] In Inquiry Concerning a Judge, an Alaska Supreme Court justice sent three letters on judicial chambers stationery to opposing counsel regarding a personal matter.[5] The court held that it was irrelevant that the “intended recipients of the letters were not influenced in fact by the chambers stationery.’ ’[6] The court noted that using judicial stationery for personal reasons would likely cause the public to believe that the justice is “unable to distinguish his judicial activities from his personal ones. This failure to maintain separate interests could lead a reasonable person to believe that petitioner’s judicial decision-making ability similarly might be flawed.’ ’[7]
In interpreting the judicial canons, we adopt the objective reasonable person standard. In applying that standard, we conclude that there was clear and convincing evidence produced at the evi-dentiary hearing that an objective reasonable person could conclude that Judge Mosley wrote letters on his judicial letterhead to his son’s school in an attempt to gain a personal advantage in violation of NCJC Canon 2B.

Counts III & IV: Ex parte communication and own recognizance (OR) release

District Judge John McGroarty testified that in 1999 he was assigned a criminal case concerning Robert D’Amore. According to *915 Judge McGroarty, the case originally involved a burglary and a theft, which was eventually negotiated to attempted theft. Judge McGroarty stated that the plea bargain required D’Amore to make restitution payments of $10,000 a month. Additionally, Judge McGroarty testified that because DAmore failed to attend some hearings or make payments, he issued a bench warrant for $10,000. At the time Judge McGroarty issued the bench warrant, DAmore had entered a plea but had not been sentenced. DAmore was eventually arrested on the bench warrant.
Barbara Orcutt testified that in August 1999, she learned that DAmore, a former employee, had been arrested on a bench warrant. Orcutt stated that she called her friend, Judge Mosley, to see if he would issue an OR release because DAmore’s mother was concerned about DAmore’s health, and he would not be a flight risk.
Judge McGroarty testified that Judge Mosley contacted him and asked if he would mind if Judge Mosley issued an OR release for D’Amore. Judge McGroarty testified that he would not have issued an OR release because of the preexisting bench warrant. Additionally, however, Judge McGroarty stated that he did not find his conversation with Judge Mosley unethical. Judge McGroarty also testified that Judge Mosley had the power to issue an OR release without consulting him and that the same type of situation had happened once or twice before. When Judge McGroarty was asked whether a judge with equal jurisdiction had overridden one of his bench warrants, he answered “[n]ot of equal jurisdiction.’ ’
Peter Dustin, an investigative aide for the Las Vegas Metropolitan Police Department, testified that he had several contacts with D’Amore. Dustin stated that he received a telephone call from Judge Mosley in August 1999 asking him what he knew about DAmore. According to Dustin, he told Judge Mosley that DAmore “was a con man and that . . . if he was out he’d probably do it again.”
Judge Mosley stated that in his twenty-three years’ experience as a district court judge, he never called a district attorney regarding an OR release. Alexandra Chrysanthis, the district attorney in D’Amore’s case, testified that she would have objected to issuing D’Amore an OR release had she been contacted. Judge Mosley testified that he had already made the decision to grant the OR release before he spoke with Judge McGroarty, but called Judge McGroarty as a matter of courtesy and policy. Further, Judge Mosley stated that Judge McGroarty responded to his query about an OR release, “Mos, it’s your call.” Judge Mosley ultimately called the jail and granted D’Amore an OR release.
*916 The Commission found that Judge Mosley violated NCJC Canons l,[8] 2,[9] 2A and 3B(7)[10] by engaging in an ex parte communication with Orcutt regarding D’Amore’s arrest and release and violated NCJC Canons 1, 2, 2A and 2B by ordering the release of DAmore on his OR at Orcutt’s request, without notifying the district attorney’s office. The discipline that the Commission ordered for the violations in Counts HI and IV was “a strongly worded censure.”
Judge Mosley contends that the special prosecutor did not provide clear and convincing evidence that he engaged in an improper ex parte communication with Orcutt. Instead, he asserts that his ex parte communications were expressly authorized by law. *917 According to Judge Mosley, it was common practice in the Eighth Judicial District for a district judge to respond to calls from the public, police, district attorneys, and defense attorneys regarding OR releases. Judge Mosley also asserts that under the totality of the circumstances,[11] including the common practice in the district and the fact that his conduct in speaking to Orcutt was not considered unethical by the other district judges, he should not be found to have violated the code of conduct.
Testimony from a number of district court judges established that for many years, the custom and practice of some judges in Clark County was consistent with Judge Mosley’s ex parte conversations with Orcutt. The judges testified that they would get calls from police officers, defense attorneys and private citizens requesting OR releases, bail reductions or bail increases for defendants in custody. This practice continued with the acquiescence of every district attorney for over thirty years.
The practice usually occurred in situations in which the accused had not been brought before a magistrate for an initial appearance, and it was understood that such relief would be reviewed at the first appearance before the judge assigned to the case. Since all of the district attorneys during the entire period acquiesced in the policy, it cannot be said that the ex parte conversations were not approved by the opposing party. The district attorney at the time of Judge Mosley’s hearing and the judges who had been in private practice all had participated in the custom of getting OR releases for clients and others. Also, police frequently relied upon getting an OR release from a judge to help them in their law enforcement activities.
Judge Mosley’s contact with Orcutt and his release of D’Amore was within the spirit of the local practice. It is true that the local practice violated the Canons to the extent that the general public may not have known about the procedures available and OR releases were frequently granted upon the requests of a judge’s family or friends, thus creating an appearance of special favors. But, because of the custom and practice in Clark County, however flawed, with the acquiescence of the district attorneys, we reverse the Commission’s finding that Judge Mosley violated NCJC Canons 1, 2, 2A and 3B(7) as alleged in Counts III and IV.[12]

*918
Counts VI, VII, and VIII: Ex parte communication and delayed recusal

Joseph McLaughlin was charged with first-degree kidnapping with use of a deadly weapon, robbery with use of a deadly weapon, burglary with use of a deadly weapon and cheating at gambling. McLaughlin was represented on these charges by attorney Catherine Woolf. Pursuant to plea negotiations, McLaughlin pleaded guilty to robbery and burglary without the use of a deadly weapon, and agreed to testify against his co-defendant. In July 1997, McLaughlin’s case was transferred to Judge Mosley.
Woolf testified that around August 1997, McLaughlin told her that Figliuzzi was living at his house, and that he was unhappy with the way she was taking care of Michael, her son with Judge Mosley. Woolf testified that McLaughlin was unaware at this time that his case had been reassigned to Judge Mosley. Woolf also testified that she told McLaughlin that if he cooperated with Judge Mosley in the child custody case, Judge Mosley would have to re-cuse himself in McLaughlin’s criminal case. She testified that she was unhappy that McLaughlin’s case had been transferred to Judge Mosley because he was known as a harsh sentencer.
Woolf subsequently met with Judge Mosley in his chambers. Only Woolf and Judge Mosley were present, and neither Woolf nor Judge Mosley notified the district attorney. Woolf testified that she stated at the beginning of the meeting that McLaughlin had been assigned to his chambers for sentencing. Woolf testified that she informed Judge Mosley that District Judge Gene Porter had taken McLaughlin’s plea and that McLaughlin “was cooperating with the authorities on this case” and on another case. Woolf also testified that McLaughlin’s sentencing date had been continued due to his cooperation in the other criminal case. Woolf testified that they then discussed the information that McLaughlin and his wife had concerning Michael. Woolf testified that Judge Mosley asked Woolf to meet with Judge Mosley’s attorney, Carl Lovell. Woolf stated that Judge Mosley never indicated at this meeting that he was planning to recuse himself from McLaughlin’s criminal case.
A second meeting took place at Lovell’s office with Judge Mosley, Lovell, Woolf, McLaughlin, and McLaughlin’s wife. Woolf testified that at the meeting, Judge Mosley discussed his son and the custody battle, asking a series of questions regarding Figliuzzi and Michael. Woolf stated that at some point in the conversation, Woolf again mentioned that Judge Mosley was assigned to McLaughlin’s case. Lovell testified that he first became aware at this meeting that McLaughlin’s criminal case had been assigned to Judge Mosley. After the meeting, the McLaughlins signed affidavits for Judge Mosley to use in his custody case.
*919 According to Woolf’s testimony, the McLaughlins testified in Judge Mosley’s custody case on October 10, 1997. At that point, Woolf stated that she had not received notification that Judge Mosley had recused himself from McLaughlin’s criminal case. Lois Bazar, Judge Mosley’s judicial assistant, testified that on the morning of October 10, 1997, the first day of the child custody hearing, Judge Mosley told Bazar to recuse him from McLaughlin’s case. The district court entered the actual recusal order into the minutes on the afternoon of October 10, 1997. Judge Mosley admitted that the recusal order was entered after McLaughlin’s wife testified in his custody case. Bazar testified that Judge Mosley’s normal practice was to wait until the next scheduled court date before he would recuse himself, and that recusing himself before the date for McLaughlin’s court appearance deviated from Judge Mosley’s normal practice.
The Commission held that Judge Mosley violated NCJC Canon 3B(7) for engaging in an ex parte meeting with Woolf in his chambers as alleged in Count VI, that he violated NCJC Canon 3B(7) by engaging in an ex parte meeting with Woolf and the McLaughlins at Lovell’s office as alleged in Count VII, and that he violated NCJC Canons 1, 2, 2A and 2B by failing to recuse himself from the McLaughlin case until October 10, 1997, the date of the custody hearing, as alleged in Count VIH. The discipline that the Commission imposed for Count VI was “a strongly worded censure,” for Count VE attendance at the National Judicial College ethics course, and for Count VO a $5,000 fine.
Judge Mosley argues that his conversations were not ex parte communications because the merits of the McLaughlin case were not discussed during the meetings. However, Woolf testified that they did discuss the merits of McLaughlin’s case. Woolf told him about McLaughlin’s plea and alleged that he was cooperating with the police. This is the very information that a sentencing judge would consider — the fact that McLaughlin was cooperating with authorities and testifying in another case. It is information that is not appropriate for ex parte conversations and should only be communicated with the district attorney present. The Commission could choose to believe Woolf’s testimony.
Judge Mosley also argues that this situation concerned an emergency involving his son’s welfare. Even if an emergency was involved, the conditions under which ex parte meetings are allowed were not followed, as NCJC Canon 3B(7)(a) provides, in pertinent part:
Where circumstances require, ex parte communications for . . . emergencies that do not deal with substantive matters or issues on the merits are authorized; provided:
*920 (i) the judge reasonably believes that no party will gain a procedural or tactical advantage as a result of the ex parte communication, and
(ii) the judge makes provision promptly to notify all other parties of the substance of the ex parte communication and allows an opportunity to respond.
Substantive matters in McLaughlin’s case were discussed at the ex parte meeting, and Judge Mosley did not notify the district attorney’s office after the meeting took place. Furthermore, there is also evidence that Woolf intended to gain a procedural advantage as a result of these ex parte communications because she hoped Judge Mosley would have to recuse himself if the McLaughlins testified at Judge Mosley’s custody hearing. Even if the judge did not know this, the judge had to realize that the McLaughlins would expect to get an advantage in the criminal case by testifying in favor of the judge on a matter important to the judge.
Count VIE addresses the timing of Judge Mosley’s recusal from the McLaughlin case. Judge Mosley did not recuse himself from that case until October 10, 1997, the day of the child custody hearing. Since McLaughlin’s attorney had not been notified of any recusal by Judge Mosley by the time of the hearing, it can be inferred that the McLaughlins did not know. Mrs. McLaughlin had already testified on behalf of Judge Mosley by the time of the recusal.
Since Judge Mosley had not recused himself, the McLaughlins may reasonably have believed that if they testified favorably to Judge Mosley in his child custody case, McLaughlin would have an advantage at sentencing. Judge Mosley’s delay in recusing himself also raises the implication that he wanted to make sure the testimony was in his favor, not that he wanted to see if the testimony was “genuine,” as he alleges.
Judge Mosley asserts that a recusal is not required at any particular time so long as it is accomplished. Judge Mosley also argues that judges do not have a duty to recuse themselves unless a clear and valid reason exists for doing so.[13] Therefore, Judge Mosley argues that he was not unreasonable in waiting to determine whether the McLaughlins’ testimony was genuine before he re-cused himself.
We conclude that Judge Mosley is wrong. Judge Mosley should have recused himself immediately after he received a telephone call from Woolf notifying him that the McLaughlins had information about his custody case and that Mr. McLaughlin was assigned to *921 his chambers for sentencing. As the Wisconsin Supreme Court observed in Disciplinary Proceedings Against Carver,[14] there is a danger that a judge’s failure to immediately recuse himself would lead others to conclude that the judge was not going to do so. A reasonable, objective observer could conclude that the judge was using his position for personal advantage, thereby diminishing public confidence in the integrity and impartiality of the judiciary. Therefore, we conclude that the Commission did not err in determining that Judge Mosley violated NCJC Canons 1, 2, and 3B(7).

Expert witness

Judge Mosley asserts that the Commission violated the Due Process Clauses of the Nevada and United States Constitutions by excluding the testimony of his expert witness, Professor Stempel. Stempel had been watching the proceedings from the beginning and was to act as a summary witness, stating his opinion as to whether Judge Mosley had violated the rules of ethics.
Under the Commission rules, the Nevada rules of evidence apply. NRS 50.275 provides that an expert may testify “[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue.’ ’ We have held that “[wjhether expert testimony will be admitted, as well as whether a witness is qualified to be an expert, is within the district court’s discretion, and this court will not disturb that decision absent a clear abuse of discretion.”[15] The goal of expert testimony “ ‘is to provide the trier of fact a resource for ascertaining truth in relevant areas outside the ken of ordinary laity.’ ”[16] The Commission determined that its members did not require expert assistance to decide whether Judge Mosley’s conduct violated the canons. The Commission had that discretion. As an article in the Judicial Conduct Reporter states:
Judicial conduct organizations often have the difficult job of determining ethical issues of first impression in their states, or perhaps, nationally. That important job should not be delegated to an expert witness in a proceeding. No legal scholar or judge familiar with the customs of a judicial community possesses unique knowledge of ethical standards that is more reliable than the independent decision-making of the members *922 of the judicial conduct organization. By relying on their own expertise as representatives of the public and legal community, rather than the opinions of experts, a judicial conduct commission fulfills its official public responsibility to formulate the appropriate ethical standards for their states.[17]
Judge Mosley argues that other witnesses were used as experts and asked hypothetical questions, and therefore, he had a right to call his expert. Considering that both sides had elicited opinions on ethics throughout the hearing from most witnesses, the testimony could well have been cumulative. We conclude that the Commission did not abuse its discretion in excluding Judge Mosley’s expert witness.

Hypothetical questions

During the evidentiary hearing, the Commission members asked a number of hypothetical questions of various witnesses. Judge Mosley contends that his due process rights were violated when the commissioners and the special prosecutor asked unqualified expert witnesses hypothetical questions. We disagree.
NRS 50.265 provides that lay witness testimony must be “[r]ationally based on the perception of the witness” and “[h]elpful to a clear understanding of his testimony or the determination of a fact in issue.” The hypothetical questions that the Commission asked of judges and attorneys were all questions that would be helpful to determine a fact in issue, since most of the questions related to Judge Mosley’s defense that his actions were part of a common practice in the Eighth Judicial District. The suggestion that the judges and attorneys were unqualified to give their observations and opinions on the common practice in the district is without merit. Both sides asked hypothetical questions of witnesses, most without objection. The Commission was within its discretion to ask the questions and did not violate Judge Mosley’s right to due process.

The Commission’s public statements

Finally, Judge Mosley contends that the Commission made an improper statement in violation of CPR 7. We disagree.
CPR 7 provides:
In any case in which the subject matter becomes public, through independent sources, or upon a finding of reasonable probability and filing of a formal statement of charges, the commission may issue statements as it deems appropriate in *923 order to confirm the pendency of the investigation, to clarify the procedural aspects of the disciplinary proceedings, to explain the right of the respondent to a fair hearing without prejudgment, and to state that the respondent denies the allegations. At all times, however, the commission, its counsel and staff shall refrain from any public or private discussion about the merits of any pending or impending matter, or discussion which might otherwise prejudice a respondent’s reputation or rights to due process.
On May 9, 2000, Leonard Gang, the Executive Director of the Judicial Discipline Commission at that time, stated in a Las Vegas Review-Journal article that:
[H]e could not speak about Mosley’s contentions that the commission is unconstitutional.
Gang said every state has a judicial discipline commission, and the constitutionality of Nevada’s commission has been upheld by the court.
“The commissions around the United States are all pretty similar,” Gang said. “I know of no one that has been found unconstitutional.’ ’
Judge Mosley asserts that Gang’s comments created an appearance of partiality on the part of the Commission because Gang directly attacked the merits of Judge Mosley’s legal position.
We conclude that Judge Mosley’s argument is without merit. Gang’s comment merely discussed the law and did not address, the merits of Judge Mosley’s case.

CONCLUSION

We affirm the Commission’s determination that Judge Mosley violated NCJC Canons 1, 2, 2A, 2B, and 3B(7) in Counts I, II, VI, VII and VIII and the imposition of the discipline requiring Judge Mosley to attend the next general ethics course at the National Judicial College, to pay a $5,000 fine to the Clark County library or a related library foundation, and to receive censures for unethical conduct. We reverse the determination of violations in Counts in and IV.
Agosti, J., concurs.

 108 Nev. 251, 267, 830 P.2d 107, 117-18 (1992), overruled on other grounds by Matter of Fine, 116 Nev. 1001, 1022 n.17, 13 P.3d 400, 414 n.17 (2000); see also Nev. Const, art. 6, § 21.

 108 Nev. at 267, 830 P.2d at 118.

Liljeberg v. Health Setyices Acquisition Corp., 486 U.S. 847, 864-65 (1988).

 822 P.2d 1333, 1336 (Alaska 1991).

 Id. at 1341.

Id.

NCJC Canon 1 provides, in pertinent part: “A judge should participate in establishing, maintaining and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved.”

NCJC Canon 2 provides, in relevant part:
A. A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
B. A judge shall not allow family, social, political or other relationships to influence the judge’s judicial conduct or judgment. A judge shall not lend the prestige of judicial office to advance the private interests of the judge or others; nor shall a judge convey or permit others to convey the impression that they are in a special position to influence the judge.

NCJC Canon 3B(7) provides:
A judge shall accord to every person who has a legal interest in a proceeding, or that person’s lawyer, the right to be heard according to law. A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding except that:
(a) Where circumstances require, ex parte communications for scheduling, administrative purposes or emergencies that do not deal with substantive matters or issues on the merits are authorized; provided:
(i) the judge reasonably believes that no party will gain a procedural or tactical advantage as a result of the ex parte communication, and
(ii) the judge makes provision promptly to notify all other parties of the substance of the ex parte communication and allows an opportunity to respond.
(b) A judge may obtain the advice of a disinterested expert on the law applicable to a proceeding before the judge if the judge gives notice to the parties of the person consulted and the substance of the advice, and affords the parties reasonable opportunity to respond.
(c) A judge may consult with court personnel whose function is to aid the judge in carrying out the judge’s adjudicative responsibilities or with other judges.
(d) A judge may, with the consent of the parties, confer separately with the parties and their lawyers in an effort to mediate or settle matters pending before the judge.
(e) A judge may initiate or consider any ex parte communications when expressly authorized by law to do so.

See In re Greenberg, 318 A.2d 740, 741 (Pa. 1974) (noting that it is the court’s “duty to consider the totality of all the circumstances when determining questions pertaining to professional and judicial discipline”).

Although we reverse the findings of the Commission in this instance, nothing in our decision should be read to suggest the judges in Clark County may continue the practices that do not comply with the recently enacted Rule 3.80 of the Rules of Practice of the Eighth Judicial District Court.

See Ham v. District Court, 93 Nev. 409, 414, 566 P.2d 420, 423 (1977) (noting that “ ‘[a] judge has a discretion to disqualify himself as a judge in a case if he feels he cannot properly hear the case because his integrity has been impugned’ ” (quoting State v. Allen Superior Court No. 3, 206 N.E.2d 139, 142 (Ind. 1965))).

 531 N.W.2d 62, 69 (Wis. 1995).

Mulder v. State, 116 Nev. 1, 12-13, 992 P.2d 845, 852 (2000).

Prabhu v. Levine, 112 Nev. 1538, 1547, 930 P.2d 103, 109 (1996) (quoting Townsend v. State, 103 Nev. 113, 117, 734 P.2d 705, 708 (1987)).

Marla N. Greenstein & Steven Scheckman, The Judicial Ethics Expert Witness, Jud. Conduct Rep., Winter 2001, at 1.