RAY PINEDA, Appellant, v. THE STATE OF
NEVADA, Respondent.

No. 36931

May 4, 2004                                          88 P.3d 827

*Charles C. Diaz,* Reno, for Appellant.

*Brian Sandoval,* Attorney General, Carson City; *Richard A. Gammick,* District Attorney, and *Joseph R. Plater III,* Deputy District Attorney, Washoe County, for Respondent.

## OPINION

By the Court, MAUPIN, J.:

Appellant, Ray Pineda, was tried below before a jury and found guilty of second-degree murder with use of a deadly weapon. The district court thereafter sentenced Pineda to serve two consecutive terms of life imprisonment with the possibility of parole after ten years on each sentence.

Pineda contends on appeal that the district court erred in ordering in limine that the State could introduce evidence of his prior convictions for impeachment purposes should he decide to testify, rejecting Pineda's proposed jury instructions on the issue of self-defense, and in its refusal to admit expert testimony proffered by Pineda on the generalities of gang culture and gang life.

We reverse the judgment of conviction and remand for a new trial.

### FACTS

According to trial witnesses, including Pineda himself, Pineda spent his adolescent years in El Centro, California, during which he was substantially immersed in a gang and drug subculture. He

was the perpetrator as well as the victim of numerous acts of violence and became addicted to controlled substances. In 1999, he moved to Sparks, Nevada, where he sought and maintained relatively stable employment until his arrest in connection with this case. He was attacked twice after moving to northern Nevada, once by his brother in October 1999, and again in November 1999 by several assailants in downtown Reno. As of December 2, 1999, the night of the homicide that is the subject of this appeal, Pineda resided with a couple, Leonard Anaya and Chargal Woefle. During the evening of December 2, 1999, a series of interactions occurred involving Pineda, Anaya, Woefle, another couple, Adrianna Melendez and Jorge Chacon, and the victim, Julio Jimenez.

Chacon and Jimenez had been members of a northern Nevada street gang with whom Pineda and Anaya had no association. Upon being introduced to Chacon on December 2, 1999, Pineda identified himself by his gang alias, ''Lazy from El Central.'' According to his testimony, Pineda did this to diffuse any suspicion or concerns that Chacon might have harbored over the possibility that Pineda may have been a member of a local rival street gang. Although the group socialized through much of the evening, tensions among them escalated after Pineda and Anaya refused to assist or ''back up'' Chacon and Jimenez during a potential altercation with unidentified third parties. Chacon and Jimenez were intoxicated and Chacon expressed dissatisfaction during the course of the evening over Pineda's failure to commit assistance to Chacon should another problem arise. The situation reached its apex in a restaurant parking lot when Chacon continued to confront Pineda and when Jimenez approached Pineda despite a warning by Pineda to stop his advance. A physical altercation ensued during which Pineda stabbed Jimenez several times and, in doing so, inflicted mortal wounds from which Jimenez died several hours later in a local hospital.

Present at the parking lot were Pineda, Chacon, Melendez, Jimenez, Anaya and Woefle. Pineda testified he and Chacon exited the vehicle to relieve themselves, and that Chacon approached and again confronted him. Chacon appeared to be calming down when Melendez approached and tried to pull Chacon away from Pineda. Unfortunately, this only incensed Chacon, after which Jimenez approached Pineda in a threatening manner. According to Pineda, he told Jimenez to ''back up,'' Jimenez continued to advance, and Pineda then pulled a knife from a sheath inside his trousers in an attempt to ward off what he perceived as an attack. Jimenez pressed forward notwithstanding the weapon and, as noted, was stabbed several times during the interchange that followed. Pineda described the knife as a nine-inch throwing knife that he carried with him to work to cut packing tape and open boxes. Pineda also

testified to his assumption that Chacon and Jimenez might carry weapons since they were gang members, that he did not intend to kill Jimenez, that he only wanted to extricate himself from the situation, and that the separate recent attacks on his person increased his level of apprehension when confronted by Chacon and Jimenez.

No one actually saw Pineda stab Jimenez during the altercation. Interestingly, Chacon denied any memory of the incident, claiming an advanced state of intoxication, but testified that neither he nor Jimenez habitually or regularly carried arms. Woefle substantially confirmed Pineda's testimonial description of events that evening, but only saw the men fighting and could not describe how the knifing of Jimenez occurred. She related that Pineda eventually subdued Jimenez by placing him in a headlock, that Jimenez was bleeding profusely after Pineda released him and that, after his release from Pineda, Jimenez's viscera were exposed. Woefle offered one additional fact to the description of events: that she saw Jimenez approach and touch Pineda on the shoulder in a nonaggressive manner, at which time Pineda punched Jimenez and the fight proceeded from there. Pineda confirmed at trial that Jimenez never used or displayed a weapon of any kind during the events pertinent to this appeal.

During his trial testimony, Pineda admitted that he lied to detectives following his arrest when he claimed that Jimenez brought the knife to the fight. His explanation for lying about the incident was that he was afraid. He also told the jury that he and Woefle fled the scene and the Reno area to avoid retaliation from Chacon and his street gang.

Pineda argued at trial that he was not guilty by reason of self-defense. To support this theory, Pineda's counsel presented a comprehensive offer of proof through Dr. Ron Martinelli, a highly experienced expert on gang life and culture in California and Nevada. Dr. Martinelli was principally called to testify to the generalities of gang life and that a person in that culture would reasonably conclude that a confrontation similar to that described by Pineda and in the police investigative file would result in an imminent danger to life or bodily injury. However, Dr. Martinelli admitted that he: (1) was not familiar with Pineda's particular gang existence in California, (2) was not familiar with the gangs to which the other testifying witnesses belonged, and (3) did not have personal knowledge about the gang activity of the individuals involved in this case. The district court refused to allow Dr. Martinelli to testify during the guilt phase of the trial based upon the general nature of his testimony and his lack of familiarity with the principals involved.

As discussed below, the district court instructed the jury on self-defense in a manner disapproved of by this court in *Culverson*

*v. State.*[2] Thereafter, the jury found Pineda guilty of second-degree murder with the use of a deadly weapon. Pineda appeals from the judgment of conviction entered upon the verdict.

## DISCUSSION

I.  *Admission of Pineda's prior convictions for impeachment purposes*

Pineda's criminal record contains two prior felony convictions, one drug related and another involving the making of a terrorist threat. Pineda now challenges a pretrial order in limine that the convictions could be used by the State for impeachment under NRS 50.095(1)[3] should he choose to testify.

At trial, Pineda's attorney called Pineda as a witness and introduced the fact of the convictions during his direct examination. Thus, as a threshold matter, the State contends that Pineda waived his right to contest the ruling in limine on appeal because he himself elicited this evidence. Because Nevada law concerning such waivers by a defendant is unclear, we take this opportunity to clarify our views on the issue.

The State relies upon *Ohler v. United States*[4] in support of its waiver argument. In *Ohler,* the United States Supreme Court concluded that a defendant waives his appellate standing concerning admission of prior convictions when he preemptively introduces the prior convictions after an unfavorable ruling on a motion in limine.[5] Because such orders may be revisited at any time during trial, *Ohler* notes that " '[a]ny possible harm flowing from a district court's *in limine* ruling permitting impeachment by a prior conviction is wholly speculative.' "[6] Several states have adopted this rule,[7] while others have rejected it.[8] States that have rejected

---

[2]106 Nev. 484, 487-88, 797 P.2d 238, 239-40 (1990).

[3]NRS 50.095(1) provides:

> For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime is admissible but only if the crime was punishable by death or imprisonment for more than 1 year under the law under which he was convicted.

[4]529 U.S. 753 (2000).

[5]*Id.* at 760.

[6]*Id.* at 759 (quoting *Luce v. United States,* 469 U.S. 38, 41 (1984)).

[7]*See Rivers v. State,* 792 So. 2d 564, 566-67 (Fla. Dist. Ct. App. 2001); *People v. Rodgers,* 645 N.W.2d 294, 302 (Mich. Ct. App. 2001); *State v. Frank,* 640 N.W.2d 198, 202-03 (Wis. Ct. App. 2001).

[8]*See Ohler,* 529 U.S. at 762-63 (Souter, J., dissenting); *State v. Keiser,* 807 A.2d 378, 387 (Vt. 2002); *State v. Thang,* 41 P.3d 1159, 1167-68 (Wash. 2002); *State v. Daly,* 623 N.W.2d 799, 801 (Iowa 2001); *see also State v. Dunlap,* 550 S.E.2d 889, 896-97 (S.C. Ct. App. 2001) (citing *Ohler* and relying on state law grounds to address defendant's claim).

*Ohler* have done so because a trial court is fully aware of the proposed evidence and law when ruling on such evidence in limine, and it is a poor trial tactic for defense attorneys to wait for the prosecution to introduce such evidence on cross-examination.[9] Given the nature of this tactical dilemma, these courts have held that a defendant may under such circumstances appeal a trial court's preliminary ruling conditionally admitting prior bad acts or convictions for impeachment purposes.[10] Given our recent decision in *Richmond v. State,* we agree that on appeal from a final judgment of conviction, a defendant may properly challenge such a trial court ruling.[11]

By way of history, we held in *Rice v. State*[12] that, because pretrial rulings in limine do not bind a district court and may be reversed or modified at trial, a defendant in criminal proceedings must object to evidence when presented at trial to preserve the issue for appeal.[13] However, in *Richmond* we modified *Rice,* concluding that

> where an objection has been fully briefed, the district court has thoroughly explored the objection during a hearing on a pretrial motion, and the district court has made a definitive ruling, then a motion in limine is sufficient to preserve the issue for appeal.[14]

In the present case, both parties fully briefed the issue, the district court conducted a hearing, and the district court made a definitive ruling to admit both of Pineda's prior felony convictions for impeachment purposes should Pineda choose to testify. Here, had Pineda's counsel waited for the State to introduce the evidence of Pineda's prior felony convictions, he could have tested the validity of that ruling on appeal from the judgment of conviction under *Richmond.* As a logical extension of *Richmond,* we now choose to follow those states that allow appellate consideration of the admissibility of criminal convictions for impeachment purposes where the defendant, as a tactical matter, elects to introduce such evidence after having objected to basic admissibility via a fully litigated motion in limine. This approach permits appellate review of whether the impeachment material was properly admitted in the first instance. We also agree with Justice Souter's dissent in *Ohler* that the majority position creates an anomaly in which a

---

[9]*Ohler,* 529 U.S. at 762 (Souter, J., dissenting); *Thang,* 41 P.3d at 1167-68; *Daly,* 623 N.W.2d at 801.

[10]*See Daly,* 623 N.W.2d at 801; *Thang,* 41 P.3d at 1168.

[11]118 Nev. 924, 59 P.3d 1249 (2002).

[12]113 Nev. 1300, 949 P.2d 262 (1997).

[13]*Id.* at 1311, 949 P.2d at 269.

[14]*Richmond,* 118 Nev. at 932, 59 P.3d at 1254.

silent defendant who never intended to testify in the first place is given the benefit of appellate review of such a ruling.[15]

Having concluded that Pineda did not waive his right to appeal this issue, we now determine whether the district court erred in conditionally agreeing to admit Pineda's two prior felony convictions for impeachment purposes. NRS 50.095(1) and our prior case authority permit impeachment by proof of prior felony convictions which are not too remote in time.[16] Going further, we have held that NRS 50.095 imposes no requirement that such impeachment should be limited to only those felonies directly relevant to truthfulness or veracity.[17] Thus, the decision whether to admit a prior conviction for impeachment purposes "rests within the sound discretion of the trial court, and will not be reversed absent a clear showing of abuse."[18] We conclude that the district court did not abuse its discretion in agreeing to conditionally admit the prior convictions.

By testifying that he took the life of Jimenez in self-defense, Pineda placed his credibility squarely in issue. This is underscored by his admitted lies to the police at the time of his arrest and his attempts to mislead Woefle during their flight from Reno regarding whose knife was used in the altercation with Jimenez.[19] We have held, however, that prior to the admission of felony convictions for impeachment, a district court must determine whether the probative value of the proposed evidence substantially outweighs its potential for unfair prejudice.[20] Pineda contends that the district court did not properly undertake this balancing exercise.

The district court determined that Pineda's drug and terrorist threat convictions were probative of Pineda's credibility as a witness testifying in his own defense. Subsequently, the district court attempted to balance the competing interests associated with the introduction of the evidence by offering to redact any mention of the word "terrorist" from Pineda's second conviction. However, Pineda's counsel expressed concerns over the more personal con-

---

[15]*See Ohler,* 529 U.S. at 760-61 (Souter, J., dissenting).

[16]*See Yates v. State,* 95 Nev. 446, 449-50, 596 P.2d 239, 241-42 (1979).

[17]*Id.*

[18]*Givens v. State,* 99 Nev. 50, 53, 657 P.2d 97, 99 (1983), *overruled on other grounds by Talancon v. State,* 102 Nev. 294, 721 P.2d 764 (1986); *see also* NRS 50.095.

[19]Woefle testified in the State's rebuttal case that Pineda claimed during their flight from Reno that he had taken the knife away from Jimenez during their physical exchange.

[20]*See Yates,* 95 Nev. at 449-50, 596 P.2d at 241-42; *see also* NRS 48.035(1) ("Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury.").

notation the remaining verbiage might engender in the minds of the jury and requested that the judge not redact any of the language in the judgment of conviction.

We conclude that the district court carefully balanced the probative value of these two convictions against their possible prejudicial effect. Therefore, we conclude that the district court's ruling was not manifestly incorrect.[21]

## II. *Pineda's proposed self-defense instructions*

Pineda argues that the district court erred by not adopting his proposed jury instructions concerning self-defense. The State contends that Pineda failed to object to the instructions ultimately adopted by the district court and, therefore, is entitled only to assert plain error on appeal.[22] Although the district court did not settle jury instructions on the record, Pineda proposed alternate instructions and the minutes reflect that he objected to the instructions ultimately adopted by the court concerning (1) burden of proof, (2) duty to retreat, and (3) self-defense. We conclude that Pineda raised a sufficient objection to preserve these issues for appeal.

Pineda's argument primarily centers on the district court's jury instruction 24, which provided in part:

> The defendant has offered evidence of having acted in self-defense when Julio Jimenez was killed. Self-defense exists when the killing is committed in the lawful defense of the slayer when there is reasonable ground to apprehend a design on the part of the person slain to do some great personal injury to the slayer, *and there is imminent danger of such design* being accomplished.
>
> A bare fear of such a threat shall not be sufficient to justify the killing. It must appear that the circumstances were sufficient to excite the fears of a reasonable person, and that the party killing really acted under the influence of those fears and not in a spirit of revenge.

(Emphasis added.)

---

[21]We note that Pineda's primary attack on the ruling allowing introduction of the prior convictions does not address admissibility of the convictions under NRS 50.095(1), but rather, addresses whether the convictions were introduced as improper character evidence. *See* NRS 48.045. We reject this line of argument as being without merit and instead restrict our ruling on admissibility to an analysis of the case under NRS 50.095(1). *See Yates,* 95 Nev. at 449 n.2, 596 P.2d at 241 n.2.

[22]*See Leonard v. State,* 117 Nev. 53, 63, 17 P.3d 397, 403-04 (2001); *Cordova v. State,* 116 Nev. 664, 666, 6 P.3d 481, 482-83 (2000); NRS 178.602.

The instruction quoted above is similar to that rejected in *Culverson v. State,*[23] in which we concluded that a reasonably perceived apparent danger as well as actual danger entitles a defendant to an instruction on self-defense. We stated in *Culverson* that "[s]elf-defense may justify a homicide if a person reasonably believes that he is in danger of being seriously injured or killed by his assailant."[24] Like the discredited instruction in *Culverson,* the language in instruction 24, that "[s]elf-defense exists when . . . there is reasonable ground to apprehend [danger] . . . *and* there is imminent danger," may have tended to confuse the jury on the point of whether actual danger as opposed to apparent danger of death or great bodily harm was required for a valid assertion of self-defense to murder. At trial, the district court refused Pineda's self-defense instruction under *Culverson* that

> [s]elf-defense is a defense although the danger to life or personal security may not have been real, if a person in the circumstances and from the viewpoint of the defendant would reasonably have believed that he was in imminent danger of death or great bodily harm.

We conclude that Pineda's proposed instruction correctly stated the law concerning "real" versus "apparent" danger in cases where a defendant seeks to assert self-defense. We also note that the proposed instruction is consistent with the sample instruction approved by this court in *Runion v. State,*[25] a decision rendered after the trial in this case. Under *Culverson,* the failure in the instruction process below mandates reversal.[26]

---

[23]106 Nev. at 487-88, 797 P.2d at 239-40.

[24]*Id.* at 489, 797 P.2d at 241.

[25]116 Nev. 1041, 13 P.3d 52 (2000). The instructions in *Runion* stated, in part:

> Actual danger is not necessary to justify a killing in self-defense. A person has a right to defend from apparent danger to the same extent as he would from actual danger. The person killing is justified if:
> 1.  He is confronted by the appearance of imminent danger which arouses in his mind an honest belief and fear that he is about to be killed or suffer great bodily injury; and
> 2.  He acts solely upon these appearances and his fear and actual beliefs; and
> 3.  A reasonable person in a similar situation would believe himself to be in like danger.
> The killing is justified even if it develops afterward that the person killing was mistaken about the extent of the danger.

*Id.* at 1051-52, 13 P.3d at 59.

[26]Pineda also claims on appeal that the district court gave inconsistent instructions on the duty to retreat and that the district court improperly reversed the State's burden of proof to negate a claim of self-defense. We find no such errors in the instructions given. We also reject Pineda's invitation to revisit our

III. *Pineda's proposed expert testimony regarding "gang culture"*

Pineda claims that the district court erred in refusing to allow Dr. Martinelli's expert testimony and opinions concerning gang culture and the heightened sense of danger a person within that culture might perceive during a confrontation similar to that described by the witnesses at trial. Because we reverse and remand for a new trial based upon the self-defense instructions, we will comment briefly on the admissibility of this type of evidence upon retrial.

The admission of expert testimony is governed by NRS 50.275, which allows a qualified expert to give testimony if the "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."[27] It is quite probable that the average juror either knows little of gang subcultures, obligations placed upon its members, and the interaction of gang members either within individual gangs or between members of different gang organizations. Thus, we conclude that the defense may elicit evidence on remand from a qualified "gang" expert to testify generally to the violent nature of gang members, characteristics of southern and northern California gangs and their similarities to street gangs operating in northern Nevada, the pressures that induce membership, methods of attack through utilization of superior numbers, the propensity of gang members to carry deadly weapons, and the heightened sense of danger that gang members experience in their interactions with other persons with gang affiliations. A generalized sense of danger characteristic of gang interactions is relevant to Pineda's theory of self-defense that a reasonable person encountering Chacon and Jimenez under the circumstances described would entertain a belief of apparent imminent danger of losing his life or sustaining great bodily injury.[28] This testimony would also serve to corroborate the reasonableness of his belief that Jimenez and Chacon may have been armed given their status as street-gang members. The expert's lack of familiarity with the witnesses in this case should not disqualify the expert from giving this type of testimony.

---

prior rulings on the doctrine of "imperfect self-defense." *See Hill v. State,* 98 Nev. 295, 297, 647 P.2d 370, 371 (1982) (rejecting the "imperfect self-defense" theory).

[27]NRS 50.275 provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by special knowledge, skill, experience, training or education may testify to matters within the scope of such knowledge.

[28]*See Culverson,* 106 Nev. 484, 797 P.2d 238.

''The due process clauses in our constitutions assure an accused the right to introduce into evidence any testimony or documentation which would tend to prove the defendant's theory of the case.''[29] The interactions leading up to Jimenez's unfortunate demise are inextricably related to the egocentric nature of gang mentalities. On remand, an expert may obtain sufficient background for the generalized opinions about the reasonableness of a heightened sense of fear that a person from a gang background would harbor in such a situation by observing the in-court testimony by Pineda and the other witnesses.

Expert testimony on gang culture is particularly important in light of our conclusion, *supra,* that this case must be reversed and retried under self-defense instructions in accord with *Culverson* and *Runion.* Pineda's defense theory that he was of the reasonable belief that he could lose his life or sustain substantial injury is consistent with *Culverson* and *Runion.*[30] Our decision in *Runion* underscores that reasonably apparent danger, even where it turns out that the danger did not in fact exist, may form a legitimate claim of justifiable homicide based upon self-defense. Expert testimony concerning gang culture dovetails with our self-defense jurisprudence; such testimony does not imply that gang members are never guilty of murder when such a murder occurs in the context of a hostile armed confrontation involving gangs.

In light of the above, we reverse Pineda's judgment of conviction and remand this matter for a new trial.

SHEARING, C. J., ROSE, BECKER and GIBBONS, JJ., concur.

---

[29]*Vipperman v. State,* 96 Nev. 592, 596, 614 P.2d 532, 534 (1980).

[30]*See supra* section II.

Dr. Martinelli testified at sentencing that: (1) Pineda acted appropriately ''low key'' and nonconfrontational during the evening in question; (2) Chacon and Jimenez sought to involve Pineda in their activities and, as their guest, expected him to assist them; (3) Chacon and Jimenez felt ''disrespected'' by Pineda's refusal to assist them; (4) Chacon and Jimenez were the provocateurs during events leading to the confrontation; (5) a person in Pineda's situation as described during trial would have believed that the confrontation was a situation of imminent jeopardy and immediate desperation; and (6) a person in Pineda's situation would have done whatever was necessary to survive. We conclude that this specific factual testimony does not fall within properly admissible expert testimony for the purpose of the guilt phase of criminal proceedings. *See* NRS 50.275; NRS 50.285. The district court properly excluded expert testimony that, based upon the circumstances of the case, Pineda's decision to use deadly force was the product of a rash impulse or desperation; testimony amounting to comments on Pineda's mental processes; and testimony describing what, if any, effect the scenario described by the witnesses would have on Pineda's actual behavior. Thus, hypothetical questions based upon such information should not be allowed on remand. The district court also correctly determined that *Boykins v. State,* 116 Nev. 171, 995 P.2d 474 (2000), was not applicable to the instant controversy.

AGOSTI, J., concurring in part and dissenting in part:

I concur in the majority's determination that Pineda's conviction ought to be reversed because of the erroneous instructions given the jurors concerning the defense of self-defense. However, I disagree that, at a new trial, the jurors should be permitted to hear the testimony of Dr. Ron Martinelli, the expert called by the defense, or any other so-called expert on gang culture, who would testify concerning the reasonableness of a gang member's belief of apparent imminent danger.

The record below discloses that the defense, outside the jury's presence, offered the testimony of Ron Martinelli. Dr. Martinelli described himself as a criminologist, a criminal justice consultant and a former law enforcement officer with twenty-four years of experience as a police officer. While Martinelli was not asked to describe his qualifications for the record, his resume is a part of the record and discloses that he obtained a Doctor of Philosophy in Criminology in 1986 from Columbia Pacific University. He worked for the San Jose Police Department from 1977 through 1992. His duties while so employed were varied; ''Street Gang Investigations'' was one of a wide array of assignments. From 1992 to 1993, he was involved in the administration of the California POST accredited law enforcement Basic Police Academy. He left in 1993 to begin full-time consulting. In 1994, he served as a police officer and detective for the Morro Bay Police Department. His duties included investigating felonies, major crimes and narcotics violations. Gang work is not mentioned in the resume. Martinelli's resume also lists his work as a private consultant from 1980 through the present. His services as a consultant are varied, and gang violence and community-oriented policing strategies are mentioned, along with a variety of other areas of expertise.

The heart of Martinelli's testimony began with his agreement with Pineda's counsel that ''gang members do not act, think or react in the same fashion as nongang members.'' At this point, the trial judge intervened to ask Martinelli if he had interviewed any of the people involved in this case. Martinelli had not. The testimony continued and finally, after a lengthy hypothetical predicate, Martinelli was asked for his opinion as to whether an individual's

> gang subculture/affiliation would be a significant factor in considering or evaluating whether a reasonable person under the circumstances that existed that night that this particular individual from Southern California was confronted with, whether a person under those circumstances would have a belief that he was in imminent danger of his life or great bodily injury when confronted with these two other individuals?

In response, Martinelli testified that

> [t]here is always a risk associated with anybody involved in gang activity, the risk of injury or the risk of death. Their perception[s], because of the environment that they live in, . . . are heightened as compared to a regular person on the street . . . . I think that being involved in the totality of that gang environment and that experience, coupled with the situation that is occurring immediately in front of them in which they are directly involved, I think has a great basis on how that person is going to attempt to defend themselves or fend off an attack.

Pineda's counsel added more to his original hypothetical and eventually asked Martinelli for his opinion as to ''whether the decision to use the knife was formed in passion and was the product of an unconsidered and rash impulse.'' Martinelli responded by agreeing with counsel's statements and adding that it was

> an impulsive act, but certainly a desperate act in that case, again, given a history of a person that grew up in a gang environment, had been around violence, especially in southern California which is extremely violent, being involved in a direct confrontation with one gang member with another gang member possibly coming in and having to be held back by another person, feeling that level of jeopardy, and in recalling rat packs and what that is like in that gang environment, I think the person would be quite desperate to finish the fight with one person present for the fight with the second person.

The State objected to Martinelli's testimony and characterized the witness's conclusions, in a nutshell as, ''based upon my experience with gang members and violence out of California, he's justified in using deadly force under that factual scenario.'' In my opinion, the State's characterization is a fair one. Martinelli's testimony, if believed, permits the conclusion that every gang member has been inculcated with the belief that he must respond violently to every potential act of aggression—without the intent to commit murder as his state of mind. Martinelli has never personally interviewed Pineda nor has he consulted with any psychiatric expert who has interviewed or tested Pineda. His testimony is simply: Pineda, as a gang member, has a heightened sense that he must respond violently to protect himself and so he does not possess the intent to commit murder. If this is so, no gang member is ever guilty of murder. I cannot accept that this proposition is proper evidence for the jury and remain unconvinced that Martinelli, in any event, possesses sufficient knowledge and expertise to so testify.

It is surprising to me that the majority would volunteer that this type of evidence is admissible at a new trial. The district court al-

ready heard Martinelli and, in a proper exercise of discretion, refused to let the jury hear it. The trial judge correctly expressed his concern that basic relevance had not been established since, according to Martinelli's resume, his gang experience as a police officer was dated and was not shown to be similar to the gang environment of Reno in 2004.

Pineda's counsel sought to admit the testimony based upon the authority of *Boykins v. State*.[1] In that case, we held that the effect of domestic violence upon a person's beliefs, behavior and perception is admissible in a murder prosecution to show the defendant's state of mind.[2] Our decision in *Boykins* was based upon NRS 48.061, which authorizes the admission of expert evidence concerning the effect of domestic violence on the beliefs, behavior and perception of the person when determining state of mind or self-defense.[3] *Boykins* is this court's recognition of a legislative policy determination concerning the admissibility of evidence documenting the effects of domestic violence. Defense counsel candidly admitted to the court that there is no documented "gang member syndrome" as described in the substance of Martinelli's testimony. Counsel acknowledged that Martinelli's testimony was "cutting edge" but urged the court to accept the premise that recognition of a gang member syndrome, like Battered Women's Syndrome, had to start somewhere. Counsel asked the court to accept Martinelli's testimony as helpful for the jury concerning what Pineda was thinking, why Pineda may have reacted as he did and, though not a defense to murder, as evidence that "can go to an issue of self-defense in explaining why certain things were done." The trial judge denied Pineda's request to admit Martinelli's testimony. The trial judge's determination should be affirmed.

First, if the majority is to evaluate the trial judge's decision at all, it must do so under an abuse of discretion standard. I am hard pressed to conclude that the trial judge abused his discretion. He heard the evidence, expressed doubts based upon legal relevance as to the currency of the witness's experience and the similarity of the witness's experience in the 1970s in California to northern Nevada in 2004. These doubts are legitimate, substantive and within the discretion of the court.

Additionally, the trial judge questioned the applicability of the *Boykins* decision to the facts at hand. This also appears to be within the discretion of the trial judge. In *Boykins,* the court dealt with the application of legislative policy memorialized in a statute authorizing the admissibility of evidence of Battered Women's Syndrome. Here, we have no statute and no recognized syndrome

---

[1]116 Nev. 171, 995 P.2d 474 (2000).

[2]*Id.* at 176, 995 P.2d at 477-78.

[3]*Id.*

of a person victimized by violence who learns, as a product of such violence, patterns of survival behavior. In *Boykins,* the expert who testified was an acknowledged expert concerning Battered Women's Syndrome. The jury was required, before accepting her testimony, to determine whether Boykins had established that she suffered from Battered Women's Syndrome.

In contrast, in this case, the majority concludes that the trial judge should admit the testimony of a person with no direct experience with the current gang culture in northern Nevada, the currency of whose experience with gangs is questionable, dated and regionalized to southern California and who has not ever spoken with, tested or interviewed the defendant. The majority concludes that it is permissible to admit "expert" testimony that the defendant's conduct in killing the victim was, as characterized by the State, justified—because the defendant is a gang member and therefore possessed of a heightened sense of danger.

Finally, I am concerned that the analysis applied by the majority in formulating the conclusion that this kind of "expert" testimony is admissible was never offered to the trial judge for his consideration. Pineda's appellate briefs never discuss *Boykins* nor do they address the specific questions that were objected to at trial and precluded by the trial judge. Instead, Pineda argues that Martinelli's testimony would have helped the jury understand the imminent danger in which Pineda found himself. Pineda argues that, because the trial judge had excluded Martinelli's testimony, he, Pineda, was forced to take the stand and, in doing so, his credibility was questioned by the State, "discrediting [Pineda's] attempts to explain his state of mind and his circumstances." The majority's analysis morphs Pineda's appellate argument further into an analysis which would permit the use of "expert" testimony descriptive of a generalized sense of danger that is characteristic of gang interactions to support Pineda's claim of self-defense. If only this were so. The fact is, Martinelli's testimony was offered at trial, as stated explicitly by Pineda's trial counsel, to show, "what perhaps Mr. Pineda was thinking or why he may have reacted the way that he reacted on this particular occasion."

If we are indeed to leave questions of the admissibility of evidence to the discretion of the trial judges, then we must review the record to determine if the trial judge acted with prudence and deliberation. The record supports the conclusion that the trial judge, who had the benefit of seeing and hearing the proposed testimony during a hearing outside the jury's presence, exercised his discretion in a prudent and calmly deliberative fashion. I would not volunteer a road map for remand endorsing this evidence for another purpose which I believe is equally suspect.