OPINION
By the Court,
Hardesty, J.:
In this appeal, we consider whether the Nevada Commission on Judicial Discipline properly issued a decision to publicly censure Las Vegas Municipal Judge George Assad based on its finding that Judge Assad had violated Nevada Code of Judicial Conduct Canon 2A, as he failed to comply with the law and did not promote public confidence in the judiciary’s integrity. Judge Assad asserts several procedural objections to the Commission’s decision, as well as arguing that the charges were not sufficiently supported and that a censure is too harsh.
Although Judge Assad’s procedural objections do not require a reversal of the Commission’s decision, we note that the Commission has apparently misread our opinion in Matter of Mosley,[2] concerning when judicial ethics expert testimony is appropriate, in that the Commission views Mosley as discouraging such testimony. Such was not our intent, since judicial ethics expert testimony can provide assistance to the Commission and should be admitted if it is helpful. Having considered the proposed testimony in this case, *394 however, we are not persuaded that the Commission abused its discretion in refusing to admit it.
The violations found by the Commission are supported by clear and convincing evidence, but a censure is not warranted, as the Commission’s decision precludes any finding of willfulness and the record is replete with mitigating evidence. Accordingly, a censure, one of the most serious penalties available for nonwillful conduct, is too extreme in this instance. Instead, we conclude that Judge Assad must issue a formal apology and, at his own expense, take the next available judicial ethics class at the National Judicial College.

FACTS

The charges against Judge Assad stem from an incident that occurred in his courtroom on Monday, March 31, 2003, concerning Joshua Madera’s unpaid traffic tickets. Madera was to start a new job that day, so he telephoned the court on the previous Friday to ask for a continuance. The tickets dated from 1999 and had never been paid. Madera spoke with a court clerk who informed him that he could not obtain a telephone continuance because of his long delay in paying the fines. Madera attempted to ask if someone could appear in his place since he could not be absent from his first day at work. The conversation’s tone deteriorated; Madera became irritated and asked to speak to a supervisor, and he then told the clerk that he “knew someone in Metro.” Madera later testified that he meant to imply that he could find out how to file a complaint against the clerk. The clerk, however, testified that Madera threatened to use his Las Vegas Metropolitan Police Department contact to obtain the clerk’s home address. The clerk entered Madera’s perceived threat on the court’s computer system, which generates a printout that is provided to the traffic judge before the traffic court session.
Madera’s girlfriend, Ann Chrzanowski, then called the court and spoke with a different court clerk, who informed her that so long as Madera was not “in warrant,” meaning that a bench warrant had not already been issued for him, Chrzanowski could appear on his behalf.
The following Monday, Madera went to his new job to attend a mandatory orientation. After working a 12-hour night shift at a medical facility, Chrzanowski arrived at the municipal court in his place. She was informed that she had arrived too late for the morning traffic court session but that she could return for the 2:30 p.m. session. Meanwhile, Judge Assad asked the clerk who alleged she had been threatened by Madera to attend the session. Madera had not been notified that his alleged threat to the clerk would be discussed at the March 31 hearing.
*395 Chrzanowski returned for the 2:30 p.m. session. When Madera’s case was called at approximately 3:30 p.m., Chrzanowski approached the podium and the following exchange occurred (Chrzanowski is the “unidentified speaker”):
THE CLERK: The City of Las Vegas Municipal Court is now in session. The Honorable George Assad presiding. Please be seated.
THE COURT: City versus Joshua Madera. Okay. Where is Joshua?
UNIDENTIFIED SPEAKER: He’s actually — today he started his first day at work. That’s why he’s not here today. He’s requesting if he can just have 30 days to make that payment in full.
THE COURT: Well, the problem is he threatened someone with bodily harm, essentially.
UNIDENTIFIED SPEAKER: When was this, your Honor?
THE COURT: It was Friday. He threatened her with bodily harm, one of the court clerks.
UNIDENTIFIED SPEAKER: I—
THE COURT: So unless you want to get him down here real quick, we’re going to have to lock you up until he gets here. I think he knew that, so that’s why he sent you here in his place.
UNIDENTIFIED SPEAKER: I — I talked to the clerk on Friday, but I—
THE COURT: Who did you talk to?
UNIDENTIFIED SPEAKER: Some lady. She said that I could come into court for him. Didn’t — she didn’t say anything about him threatening a clerk.
THE COURT: And you don’t know who you talked to?
UNIDENTIFIED SPEAKER: No. I don’t recall, your Honor. You know what? Maybe I wrote it on the paper. I’ve got Debbie, extension [ ].
THE COURT: Well Debbie’s here and she says he didn’t talk to her. So—
UNIDENTIFIED SPEAKER: Okay. Maybe he (indiscernible)—
THE COURT: I mean, there might be another Debbie.
UNIDENTIFIED SPEAKER: I have no idea.
THE COURT: Is there another Debbie down here?
THE CLERK: (Indiscernible).
THE COURT: All right.
*396 UNIDENTIFIED SPEAKER: I have no idea.
THE COURT: All right. Well, you’re going to have to go with my marshal in the back and make a phone call.
UNIDENTIFIED SPEAKER: Well—
THE COURT: Tell him you’re going to jail if he doesn’t get his butt down here—
UNIDENTIFIED SPEAKER: Okay.
THE COURT: —real fast.
Chrzanowski followed the marshal, Raul Saavedra, to a back room, which included a desk and a phone, some seating, and two holding cells. Chrzanowski called Madera, who could not come at that time. Saavedra handcuffed Chrzanowski and placed her in the women’s holding cell. Testimony at the Commission hearing indicated that this back room was quite busy during hearings, as it was used for telephone calls by defendants and others, for plea negotiations, and for arranging alternative sentencing such as work programs and house arrest. The record further reflects that the courtroom itself was very busy, even while the court session was taking place.
The court marshals attempted to contact Madera as well and communicated to him that Chrzanowski would be held until he arrived. The couple had only one vehicle, which Chrzanowski had driven to court that day. A marshal obtained Judge Assad’s permission to pick up Madera after work, shortly after 5:00 p.m., and bring him to the courthouse. Madera arrived at approximately 5:45 p.m. Judge Assad did not ask the clerk who was allegedly threatened to return at this time. Judge Assad asked Madera about the alleged threat to the clerk. Madera admitted that he had mentioned knowing someone at Metro but denied that he intended any threat; Judge Assad then granted his requested payment plan. Meanwhile, Saavedra released Chrzanowski from the holding cell.
Chrzanowski stated that she believed she was not free to go until Madera arrived. She further testified that she was “frantic,” especially when the marshals refused to let her call her work and let them know that she would likely be unable to work that evening. Subsequently, Chrzanowski filed a judicial discipline complaint against Judge Assad, which resulted in formal charges alleging that the judge violated several judicial canons, including Canons 2A, 3B(2), 3B(4), and 3B(7).
At the formal hearing, Judge Assad testified that he did not intend for Chrzanowski to be held after she made the telephone call to Madera; rather, he intended to impress upon her how serious the matter was and try to convince Madera to come as soon as possible. Saavedra testified that he understood that he was instructed to have Chrzanowski call Madera and then to hold her until Madera arrived. Another municipal court marshal testified that, had the *397 same language been used to him, he would not have felt free to release Chrzanowski without further clarification from the judge, although he indicated that he would have affirmatively sought clarification sooner, rather than hold her for two hours.
The record reflects that Madera is an ex-felon, which was partly why the clerk that he allegedly threatened was so disturbed by his comments. It further reflects that he had entered into several payment arrangements for the traffic fines at issue on March 31, 2003, that he had failed to abide by any of them, and that at the time of the discipline hearing, more than three years after the payment arrangement approved on March 31, 2003, Madera still had not paid anything toward the fines.
Judge Assad testified that, despite this flagrant disregard for his obligations, jailing Madera and other similarly situated traffic defendants was not feasible due to overcrowding in the jail. Judge Assad indicated that his frustration with this situation, which at the time consisted of four years’ delay in paying the fine, together with his perception that Chrzanowski was lying to him about the conversation with the clerk, may have played a part in his threat that resulted in Chrzanowski’s detention. Also, at the time, he had been on the bench for less than a year and was still undergoing judicial training. No similar claim of misconduct has happened before or since that incident.
In addition to testimony from several witnesses concerning the events of March 31, 2003, many witnesses testified at the hearing on Judge Assad’s behalf for mitigation purposes, describing his devotion to the law and to public service and listing his many community activities, especially those involving youth and children. These witnesses testified that Judge Assad overcame significant obstacles to become a lawyer, that he is devoted to the law and to public service, and that he genuinely seeks to do justice. Judge Assad also presented many exhibits in the form of thank you letters, certificates, and commendations for his community service and involvement. Finally, he testified that he started a municipal drug court program, patterned after the district court program, to better address these cases.
Judge Assad sought to introduce judicial ethics expert testimony in support of his position that he did not violate the judicial conduct canons, primarily that of Professor Jeffrey Stempel, a law professor at Boyd Law School. In a prehearing motion, Judge Assad maintained that admission of the testimony was proper and was required by due process. Professor Stempel’s affidavit, attached to the motion, set forth his proposed testimony.
In his affidavit, Professor Stempel assessed the credibility of at least four prospective witnesses based on their written statements and affidavits, but who later testified at the hearing. He purported to make “findings” concerning the anticipated evidence based on *398 his characterization of statements in the transcript, his credibility determinations, and his weighing of the evidence. Without any assertion that he is an expert concerning the operation of handcuffs or the audiotape equipment used in municipal court, Professor Stempel indicated that Chrzanowski could not have been handcuffed while still in the courtroom because he could not hear a “click” on the tape.[3] He also addressed irrelevant issues such as whether Chrzanowski was engaged in the unauthorized practice of law, whether she was properly characterized as a “nonlitigant” in the Commission’s complaint, and whether she could have been held in contempt. Finally, despite Professor Stempel’s concession that Judge Assad lacked authority to hold Chrzanowski as a “hostage” pending Madera’s arrival and that Judge Assad’s language indicated that she would be “locked up” until Madera appeared, he concluded that no violation had occurred because any restraint of Chrzanowski was due to Saavedra’s independent action, not Judge Assad’s instructions. The Commission orally denied the motion to admit Professor Stempel’s judicial ethics expert testimony at the beginning of the hearing and later issued a written order.
At the hearing’s conclusion, the Commission found that two violations of Canon 2A were proved by clear and convincing evidence, Chrzanowski’s detention was based on Saavedra’s “obvious misunderstanding” of Judge Assad’s intent, the incident represented an anomaly in Judge Assad’s otherwise respectable career, and a public censure was the appropriate discipline. This appeal followed.

DISCUSSION

Judge Assad raises several objections to the Commission’s decision. First, Judge Assad contends that due process required the Commission to admit his proposed judicial ethics expert testimony. Judge Assad further maintains that, in light of the substance of the proposed testimony, the Commission abused its discretion in refusing to consider it. Next, Judge Assad asserts several due process objections to the Commission’s procedure and to Canon 2A. Finally, Judge Assad contends that the Commission’s finding of violations is not supported by clear and convincing evidence and that its sanction of a public censure is too harsh.

Expert testimony

Judge Assad maintains that under due process principles he had a right to present judicial ethics expert testimony in his defense and *399 that the Commission abused its discretion in refusing to admit it. The record reflects that Judge Assad filed a prehearing motion to admit testimony from an ethics law professor in support of his defense; the motion included the professor’s affidavit, which detailed his proposed testimony. The Commission denied the motion, concluding that Professor Stempel’s testimony would not be helpful to the issues presented by the case.
Under Commission Procedural Rule 24, “[t]he rules of evidence applicable to civil proceedings apply at the hearing.” NRS 50.275 provides, “[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by special knowledge, skill, experience, training or education may testify to matters within the scope of such knowledge.” Moreover, to be admissible, evidence must be relevant,[4] that is, it must have some “tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.”[5] The determination of whether to admit expert testimony is within the Commission’s discretion.[6]
Judge Assad relies on two criminal cases in support of his argument that the Commission was required by due process to admit Professor Stempel’s testimony, Pineda v. State[7] and Vipperman v. State.[8] We note at the outset that Rule 24 provides that the rules of evidence in civil proceedings apply to Commission hearings, and thus Judge Assad’s reliance on criminal cases is questionable. Nevertheless, the rules of evidence concerning the admissibility of expert testimony do not distinguish between civil and criminal proceedings and many of our civil cases discussing NRS 50.275 rely on criminal cases,[9] so we consider Judge Assad’s arguments.
In Pineda, we reversed a conviction based on an erroneous self-defense instruction. To provide guidance for the district court on remand, we considered the defendant’s argument that his proposed expert testimony should have been admitted. We held that an expert *400 in gang culture should be permitted to testify on retrial as to certain issues only. Specifically, we indicated that the expert could
testify generally to the violent nature of gang members, characteristics of southern and northern California gangs and their similarities to street gangs operating in northern Nevada, the pressures that induce membership, methods of attack through utilization of superior numbers, the propensity of gang members to carry deadly weapons, and the heightened sense of danger that gang members experience in their interactions with other persons with gang affiliations[,][10]
since such evidence was relevant to the defendant’s theory of self-defense. We approved the district court’s exclusion of other testimony, stating that “[t]he district court properly excluded expert testimony that, based upon the circumstances of the case, Pineda’s decision to use deadly force was the product of a rash impulse or desperation; testimony amounting to comments on Pineda’s mental processes; and testimony describing what, if any, effect the scenario described by the witnesses would have on Pineda’s actual behavior.”[11] Thus, Pineda does not stand for the proposition that any expert testimony is admissible simply because it helps the proponent’s case. Rather, when such testimony is relevant to the issues presented and when it assists the trier of fact to understand the evidence or to determine a fact in issue, it may be admitted. If it is irrelevant or if it impermissibly encroaches on the trier of fact’s province, then it is properly excluded.[12]
Vipperman did not involve expert testimony at all, but simply states that a defendant may introduce any evidence “which would tend to prove the defendant’s theory of the case.”[13] Notably, however, we held that the evidence sought to be admitted in that case was properly excluded as irrelevant, since the proffered evidence would have been relevant to a self-defense or provocation theory but was not relevant to the defendant’s assertion of an alibi defense.[14]
*401 Here, Professor Stempel’s affidavit, which was attached to Judge Assad’s prehearing motion and sets forth his proposed testimony, purported to evaluate the credibility of witnesses that had yet to testify (although they had given statements during the Commission’s investigation); determined based on the March 31, 2003, court session’s audiotape that Chrzanowski could not have been handcuffed in court because no “click” could be heard on the tape; weighed “evidence” that had not yet been admitted; and discussed issues that were irrelevant to those properly before the Commission, such as whether Judge Assad would have had jurisdiction to hold Chrzanowski in contempt, whether she was engaged in the unauthorized practice of law by appearing on Madera’s behalf, and the dismissal of Chrzanowski’s civil lawsuit. Credibility determinations and weighing the evidence are tasks reserved to the Commission, and expert testimony on these issues would not have assisted the Commission to understand the evidence or resolve a disputed fact.[15] Also, as noted above, much of the affidavit concerned matters that were irrelevant to the issues before the Commission, and thus it was not admissible.[16] Accordingly, we conclude that the Commission did not abuse its discretion in refusing to admit Professor Stempel’s proposed expert testimony.
We note, however, that while the Commission did not abuse its discretion in determining that Professor Stempel’s testimony would not be helpful and excluding it on that basis, the other two reasons given by the Commission for rejecting Professor Stempel’s testimony are flawed. First, the Commission noted that it was not compelled to admit the evidence, relying on Matter of Mosley.[17] Second, the Commission adopted the special prosecutor’s words in her opposition to Judge’s Assad’s motion, stating that admission of judicial ethics expert testimony would “completely usurp the role of the Commission in this matter.” The first reason rests on an overly narrow reading of our opinion in Mosley, and the second reason fails to recognize that expert testimony may concern the ultimate issues in a case.
In Mosley, we noted that expert testimony was admissible under NRS 50.275 and that whether to admit such testimony was properly addressed to the Commission’s discretion. Under the circumstances of that case, in which the proposed expert was to testify as a “summary” witness, stating his opinion as to whether the judge *402 had violated the judicial conduct code based on the other witnesses’ testimony, we concluded that the Commission did not abuse its discretion in disallowing the testimony:
The goal of expert testimony “is to provide the trier of fact a resource for ascertaining truth in relevant areas outside the ken of ordinary laity.” The Commission determined that its members did not require expert assistance to decide whether Judge Mosley’s conduct violated the canons. The Commission had that discretion.[18]
Certainly, then, the Commission correctly stated that, under Mosley, it was not “compelled” to admit expert testimony simply because it was offered if the Commission determined that expert assistance with the particular decision at issue was not required.
In its order, however, the Commission quoted the following paragraph from Mosley as supporting its determination that it was not required to admit the testimony:
Judicial conduct organizations often have the difficult job of determining ethical issues of first impression in their states, or perhaps, nationally. That important job should not be delegated to an expert witness in a proceeding. No legal scholar or judge familiar with the customs of a judicial community possesses unique knowledge of ethical standards that is more reliable than the independent decision-making of the members of the judicial conduct organization. By relying on their own expertise as representatives of the public and legal community, rather than the opinions of experts, a judicial conduct commission fulfills its official public responsibility to formulate the appropriate ethical standards for their states.[19]
This paragraph is not the words of this court, as characterized in the Commission’s order, but in fact is the language of a scholarly article that was quoted in Mosley. And while that paragraph appropriately warns judicial conduct organizations against the dangers of ascribing greater weight to expert testimony than to the members’ own independent knowledge and expertise, our quotation in Mosley of the text was not intended to discourage the Commission from admitting such evidence, when appropriate.
The Commission’s second reason for excluding Professor Stempel’s proposed testimony, that its role would be “completely usurp [ed],” is similarly faulty. Admission of expert testimony would “completely usurp” the Commission’s role only if the *403 Commission members allowed the expert’s opinion to supplant their own evaluation and judgment. NRS 50.295 expressly permits expert testimony concerning the ultimate issue to be decided, and we perceive no reason why judicial ethics expert testimony should be singled out for exclusion on this basis.
Judge Assad avers the potential benefit of such testimony and while legal ethics materials may not be precisely “inaccessible” to Commission members, as argued by Judge Assad, an individual whose career is devoted to ethics issues will likely be more familiar with those materials than individuals who have varied full-time employment in addition to their Commission duties. Also, as Judge Assad points out, a testifying expert witness, unlike a scholarly article cited in a brief, can be cross-examined by counsel and questioned by the Commission members. The result of such questioning could easily prove helpful to the Commission in rendering its decision. We agree that expert testimony may prove helpful in many cases, and the Commission would therefore be wise to carefully evaluate whether to admit proposed expert testimony in future hearings, based on the substance of the proposed testimony and the facts of the case, rather than maintain a position that such testimony should routinely be rejected simply because the Commission is not “compelled” to admit it in every case.[20]

Miscellaneous due process objections

Judge Assad raises several due process objections to the proceedings. We conclude that they are without merit.
First, Judge Assad contends that he was denied due process by the Commission’s failure to adhere to its deadlines for preparing a written decision. Under Commission Procedural Rule 28, the Commission “shall prepare and adopt a written statement” within 20 days of reaching a decision. Commission members then have ten days to dissent or object to the written statement. Rule 28 further provides, “[ujpon filing, the commission must promptly serve a copy of the foregoing on the respondent.’ ’
Here, the Commission reached its decision on November 30, 2006. Accordingly, a written statement should have been prepared *404 by December 20, 2006. But preparation of the transcript was delayed, and so on December 15, 2006, the Commission chair entered an order extending the time to prepare written findings until 20 days after the hearing transcript was received. The transcripts were received on December 20, 2006, and so the written statement was due on January 9, 2007. Another extension order was entered on January 5, 2007, due to the Commission members’ holiday schedules and the expiration of one member’s appointment, giving the Commission an indefinite “reasonable” time to file its written decision. The written statement was eventually filed on February 8, 2007.
Judge Assad asserts that the written decision’s delay denied him due process. But he articulates no prejudice suffered as a result.[21] Moreover, Judicial Discipline Procedure 3 permits extensions of any time limits in the Commission’s procedures or its rules “for good cause shown,”[22] and Commission Procedural Rule 37 incorporates the Nevada Rules of Civil Procedure for purposes of time computations; notably, NRCP 6 permits extensions of time in most circumstances. Accordingly, we conclude that the Commission did not act improperly by extending the time for filing its written decision and that Judge Assad was not denied due process by the short delay.
Judge Assad also asserts that the Commission improperly found that he had violated Canon 3B(7) by engaging in conduct that was not included in the formal charges. He therefore asserts that he was denied due process. A review of the Commission’s decision, however, reveals that the Commission made no such finding. Rather, the Commission noted, in a footnote, that the municipal court’s computer system appeared to offer opportunities for improper ex parte contacts that could prejudice a judge’s impartiality. But the Commission did not find that, by reviewing the clerk’s computer case notation about the alleged threat, Judge Assad had committed any violation, and it did not sanction Judge Assad for this conduct. Accordingly, we reject Judge Assad’s argument that he was denied due process in this respect.
Finally, without citing to any authority discussing Canon 2A’s language, Judge Assad argues that the canon does not provide adequate notice of what conduct is prohibited, and therefore it violates due process. The Commission’s answering brief cites ample authority from other jurisdictions upholding the constitutionality of *405 language identical to Canon 2A.[23] We therefore conclude that Judge Assad’s vagueness challenge lacks merit.

Violation of Canon 2A

The Commission found that Judge Assad violated Canon 2A by threatening to detain Chrzanowski until Madera arrived and by using language that Saavedra reasonably believed instructed him to in fact detain Chrzanowski. Judge Assad maintains that the Commission’s findings are not supported by clear and convincing evidence.
Under Commission Procedural Rule 25, the special prosecutor has the burden of demonstrating facts justifying discipline by clear and convincing evidence. As noted in previous cases, the Nevada Constitution does not permit this court’s de novo review of the Commission’s factual findings.[24] Rather, our role is limited to a determination of whether the evidence in the record provides clear and convincing support for the Commission’s findings, even if it could also be reasonably reconciled with contrary findings.[25]
Canon 2A provides, ‘A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.” Here, Judge Assad admitted that he had no legal authority to detain Chrzanowski based on Madera’s failure to appear and pay the fine. Thus, Judge Assad knew that his threat to her did not “comply with the law,” it did not show respect for the law, and it did not promote public confidence in the judiciary’s integrity. We conclude that the record provides clear and convincing evidence to support this violation.
The Commission further found that Judge Assad’s language was reasonably interpreted by Saavedra to mean that he should detain Chrzanowski until Madera arrived. Specifically, the transcript indicates that Judge Assad told Chrzanowski, in Saavedra’s presence, that “unless you want to get him down here real quick, we’re going to have to lock you up until he gets here.’ ’ He further stated, “you’re going to have to go with my marshal in the back and make a phone call. . . . Tell him you’re going to jail if he doesn’t get his butt down here . . . real fast.” Another marshal testified that, *406 faced with this language, he would not have believed that he could release Chrzanowski from the back room without further instructions from the court. While Judge Assad’s subjective intent may only have been to impress Chrzanowski with the matter’s importance, his language resulted in her detention for over two hours. Clear and convincing evidence supports this violation.
Judge Assad contends that the federal court’s dismissal of Chrzanowski’s civil rights lawsuit against him is “conclusive” of this discipline proceeding. But the issues in a civil rights action under 42 U.S.C. § 1983 are different from those posed in this judicial discipline proceeding. Moreover, the civil lawsuit was dismissed based on judicial immunity, that is, any claim for damages was barred because Judge Assad was engaged in a judicial act, even if that act may have exceeded his jurisdiction.[26] We further note that neither the district court’s dismissal nor the Ninth Circuit’s affirmance even mentions the Code of Judicial Conduct. Accordingly, we reject this argument and affirm the Commission’s findings concerning the Canon 2A violations.

Propriety of sanction

Based on the violations it found, the Commission imposed a public censure. Judge Assad argues that, even if violations were properly found, a public censure is excessive.
Under the Nevada Constitution, on appeal from a Commission’s discipline decision, we may “reverse such action or take any alternative action provided in this subsection.”[27] We have previously recognized that this language “requires that this court ‘exercise [its] independent judgment regarding the appropriate sanction warranted by factual findings properly adduced by the commission.’ ”[28]
NRS 1.4653(1) permits the Commission to remove, censure, or impose other discipline on a judge if the Commission determines that the judge has engaged in willful misconduct, willfully or deliberately failed to perform judicial duties, or is habitually intem *407 perate. NRS 1.4653(2) provides that the Commission may censure or impose other forms of discipline on a judge if the Commission determines that the judge has committed an ethical violation “that is not knowing or deliberate.” Other forms of discipline are listed in NRS 1.4677 and include, among other things, a fine, probation subject to conditions, training or educational courses, remedial action, and a public apology.
Judge Assad’s actions on March 31, 2003, were improper and warrant discipline. But the Commission’s own findings, recognizing an “obvious misunderstanding” between Judge Assad and Saavedra, indicate that Judge Assad’s conduct was not willful. We further note that Judge Assad presented significant mitigating evidence in the form of witness testimony and documentation demonstrating his commitment to the public, his community service, and his sincere desire to do justice. The record also contains evidence supporting Judge Assad’s stated concern that a “scofflaw’s” attempt to evade his traffic fines be strongly addressed. And the record reflects no other misconduct by Judge Assad before or since March 31, 2003, now over five years ago.
Despite the nonwillful and isolated nature of Judge Assad’s conduct and the substantial mitigating evidence, the Commission nevertheless imposed a censure, one of the harshest sanctions available for nonwillful conduct.[29] We agree with Judge Assad that this level of discipline, which may also be imposed for willful conduct,[30] is too harsh. Balancing the violations shown with the mitigating evidence, Judge Assad’s lack of intent, and the dearth of any evidence suggesting that the violations are likely to be repeated, we conclude that an apology to Chrzanowski and attendance at a judicial ethics course properly address the violations in this case. Accordingly, we reverse the Commission’s decision concerning the discipline to be imposed. Rather, Judge Assad shall issue an apology to Chrzanowski and shall attend, at his own expense, the next available judicial ethics course offered by the National Judicial College.[31]

CONCLUSION

The Commission did not abuse its discretion in refusing to admit expert testimony, and Judge Assad was not deprived of due process by this refusal or by any other action of the Commission. Having reviewed the briefs and the record, we conclude that the Commission’s findings concerning the Canon 2A violations are supported by clear and convincing evidence, and thus, we affirm *408 that portion of the Commission’s decision. Nevertheless, a public censure is too extreme a form of discipline in this case, since the record does not support a finding that Judge Assad’s conduct was willful and reflects considerable mitigation. Accordingly, we reverse the Commission’s imposition of a censure. Judge Assad shall issue a formal apology to Ann Chrzanowski and shall enroll, at his own expense, in the next available judicial ethics class at the National Judicial College.
Maupin, Parraguirre and Douglas, JJ., concur.

 120 Nev. 908, 102 P.3d 555 (2004).

 All testimony other than Saavedra’s, including that of Chrzanowski herself, was that she was handcuffed in the back room, not in the courtroom.

 NRS 48.025(1).

 NRS 48.015.

 See Matter of Mosley, 120 Nev. 908, 922, 102 P.3d 555, 565 (2004) (reviewing the Commission’s evidentiary decisions for abuse of discretion).

 120 Nev. 204, 88 P.3d 827 (2004).

 96 Nev. 592, 614 P.2d 532 (1980).

 See, e.g., Krause Inc. v. Little, 117 Nev. 929, 933-34, 34 P.3d 566, 569 (2001); McKeeman v. General American Life Ins., 111 Nev. 1042, 1051, 899 P.2d 1124, 1130 (1995).

 Pineda, 120 Nev. at 213, 88 P.3d at 834.

 Id. at 214 n.30, 88 P.3d at 834 n.30.

 See, e.g., Schwartz v. Estate of Greenspun, 110 Nev. 1042, 1046-47, 881 P.2d 638, 640-41 (1994) (affirming exclusion of irrelevant expert testimony); Brown v. State, 110 Nev. 846, 852, 877 P.2d 1071, 1075 (1994) (upholding exclusion of expert testimony when it would be of no use to the trier of feet); Lickey v. State, 108 Nev. 191, 196, 827 P.2d 824, 826-27 (1992) (stating that “[a]n expert may not comment on the veracity of a witness”); Townsend v. State, 103 Nev. 113, 118-19, 734 P.2d 705, 709 (1987) (noting that expert opinion that invaded the jury’s province, such as testimony concerning the victim’s credibility and weighing of the evidence, was improper, although harmless error under the circumstances of the case).

 Vipperman, 96 Nev. at 596, 614 P.2d at 534.

 Id. at 595, 614 P.2d at 534.

 See Rowland v. Lepire, 99 Nev. 308, 312, 662 P.2d 1332, 1334 (1983) (noting that it is exclusively within the province of the trier of fact to weigh evidence and pass on credibility of witnesses and their testimony).

 NRS 48.025(2).

 120 Nev. 908, 102 P.3d 555 (2004).

 Id. at 921, 102 P.3d at 564 (quoting Prabhu v. Levine, 112 Nev. 1538, 1547, 930 P.2d 103, 109 (1996)).

 Id. at 921-22, 102 P.3d at 564-65 (quoting Marla N. Greenstein & Steven Scheckman, The Judicial Ethics Expert Witness, Jud. Conduct Rep., Winter 2001, at 1).

 The dissent’s position, on the other hand, extends to the other extreme by requiring the admission of evidence beyond that contemplated by Commission Rule 24 and NRS 50.275. Nothing in the rules mandates consideration of all expert witnesses in every case. The test to be applied in determining whether proposed expert testimony should be admitted must be consistent with the rules of evidence and requires the Commission, not unlike the trial judge, to evaluate whether the expert will assist them as the trier of fact with an understanding of the issues or a resolution of the disputed facts.

 See Bergendahl v. Davis, 102 Nev. 258, 260, 720 P.2d 694, 695 (1986); Anderson v. Richards, 96 Nev. 318, 323, 608 P.2d 1096, 1099 (1980).

 We note that Procedure 3 indicates that the Commission’s General Counsel/Executive Director may grant extensions; here, the Commission Chair signed the extension orders. Judge Assad has not alleged that he was prejudiced by the different signatory and so we do not address this issue.

 Matter of Young, 522 N.E.2d 386, 387-88 (Ind. 1988); Miss. Com’n on Jud. Performance v. Spencer, 725 So. 2d 171, 176 (Miss. 1998); In re Hill, 8 S.W.3d 578, 582-83 (Mo. 2000); In Re Disciplinary Action Against McGuire, 685 N.W.2d 748, 761-62 (N.D. 2004).

 Mosley, 120 Nev. at 912, 102 P.3d at 558-59; Matter of Fine, 116 Nev. 1001, 1013, 13 P.3d 400, 408 (2000).

 Mosley, 120 Nev. at 912, 102 P.3d at 559.

 Chtzanowski v. Assad, No. 06-15699, slip op. at 3-4 (9th Cir. Apr. 24, 2008) (citing Mireles v. Waco, 502 U.S. 9, 11-13 (1991); Stump v. Sparkman, 435 U.S. 349, 355-60 (1978); Sadoski v. Mosley, 435 F.3d 1076, 1079 (9th Cir.), cert. denied, 547 U.S. 1192 (2006); and Meek v. County of Riverside, 183 F.3d 962, 967-68 (9th Cir. 1999)); Chrzanowski v. Assad, No. CV-S-05-0418-RLH (PAL), slip op. at 5 (D. Nev. Feb. 13, 2006).

 Nev. Const. art. 6, § 21(1).

 Fine, 116 Nev. at 1021, 13 P.3d at 413 (quoting Goldman v. Nevada Comm’n on Judicial Discipline, 108 Nev. 251, 268, 830 P.2d 107, 118 (1992)); see also Matter of Davis, 113 Nev. 1204, 1225, 946 P.2d 1033, 1047 (1997).

 See NRS 1.4653(2).

 See NRS 1.4653(1).

 See NRS 1.4677(4) and (6).